KATHLEEN SCHNEIDER, CA BAR 174058
JENNIFER BENESIS, CA BAR 219559
JASON P. WONG, AZ BAR 024940, Counsel for Service
MCKENZIE A. LANGVARDT, CA BAR 352668
National Labor Relations Board, Region 20
450 Golden Gate Ave.
Floor 3, Suite 3112
San Francisco, California 94102
Telephone Number: (628) 221-8838
FAX: (415)356-5156
E-mail address:  Jason.wong@nlrb.gov

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JILL H. COFFMAN, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>Petitioner,<br><br>vs.<br><br>SATELLITE HEALTHCARE, INC.,<br><br>Respondent. | Civil No.<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR INJUNCTION UNDER §10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED [29 U.S.C. §160(j)]<br><br>Noticed hearing date and time: TBD |

Memorandum of Points and Authorities In Support of Temporary Injunction

# TABLE OF CONTENTS

**I.    STATEMENT OF THE CASE**.................................................................... **1**

**II.    THE STATUTORY SCHEME** ................................................................ **3**

**III.    STATEMENT OF FACTS**...................................................................... **4**

    A.    ANNUAL MERIT WAGE INCREASES. ................................................... 5

    B.    RESPONDENT'S UNLAWFUL ACTIONS AT THE VALLEJO CLINIC. ....................... 13

    C.    RESPONDENT DELAYED AND CANCELLED BARGAINING SESSIONS AND FAILED TO RESPOND TO VARIOUS UNION INFORMATION REQUESTS.........................................................17

**IV.    ARGUMENT – INTERIM RELIEF IS "JUST AND PROPER"** ............................ **19**

    A.    PETITIONER HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS............................. 19

        *1.    Respondent  Unlawfully Eliminated Wage Increases.* ........................................ *21*

        a.    Respondent's Elimination of the 2023 and 2024 Wage Increases Violated §8(a)(1) and (3) of the Act. ........................................................................ 21

        b.    Respondent Did Not Give the Union Notice and Opportunity to Bargain Before Eliminating Employees' 2023 Merit Wage Increases in Violation of §8(a)(5) of the Act. 26

        *2.    Respondent Repeatedly Threatened Workers* ................................................ *29*

        *3.    Respondent Unlawfully Terminated Mendoza.* .............................................. *31*

        *4.    Respondent Unlawfully Changed Its Time and Attendance Policies Without First Giving the Union Notice and Opportunity to Bargain in Violation of §8(a)(5) of the Act.* .. *34*

        *5.    Respondent Failed to Bargain in Good Faith with the Union in Further Violation of §8(a)(5) of the Act.* ........................................................................ *35*

        a.    Respondent Failed to Lawfully Respond to the Union's Information Requests. ..... 35

        b.    Respondent Continuously Delayed and Cancelled Bargaining Sessions. ................ 37

    B.    INTERIM RELIEF IS EQUITABLY NECESSARY TO PREVENT IRREPARABLE HARM TO EMPLOYEES' RIGHTS UNDER SECTION 7 OF THE ACT AND PROTECT THE BOARD'S REMEDIAL POWER. ........................................................................ 39

    C.    THE BALANCE OF HARDSHIPS FAVORS INTERIM INJUNCTIVE RELIEF. ...............................43

    D.    THE PUBLIC INTEREST WILL BE ADVANCED BY INTERIM INJUNCTIVE RELIEF. .................45

**V.    CONCLUSION** ................................................................................ **45**

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Aguayo v. Tomco Carburetor Co.*,
  853 F.2d 744 (9th Cir. 1988) ........................................................................................ 42, 44

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
  480 U.S. 531 (1987) ............................................................................................................ 43

*Chester v. Grane Healthcare Co.*,
  666 F.3d 87 (3d Cir. 2011) .................................................................................................. 3

*Clements v. Alan Ritchey, Inc.*,
  165 F. Supp. 2d 1068 (N.D. Cal. 2001) ............................................................................ 21

*Davis v. Servis Equipment Co.*,
  341 F. Supp. 1298 (N.D. Tex. 1972) ................................................................................. 40

*Fibreboard Paper Prods. Corp. v NLRB.*,
  379 U.S. 203 (1964) ............................................................................................................ 40

*Frankl v. HTH Corp. (Frankl I)*,
  650 F.3d 1344 (9th Cir. 2011) ................................................................................... Passim

*Frankl v. HTH Corp.*,
  825 F. Supp. 2d 1010 (D. Haw. 2011) .............................................................................. 40

*Gottfried v. Frankel*,
  818 F.2d 485 (6th Cir. 1987) ............................................................................................. 44

*Hoffman v. Inn Credible Caterers*,
  247 F.3d 360 (2d Cir. 2001) ................................................................................................ 3

*Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*,
  426 F.2d 1243 (D.C. Cir. 1970) ......................................................................................... 43

*Kava Holdings, LLC v. NLRB*,
  85 F.4th 479 (9th Cir. 2023) .............................................................................................. 32

*Lomax v. Longmont United Hospital & Centura Health*,
  2023 WL 7924735 (D. Colo. Nov. 16, 2023) .................................................................... 41

*Miller v. California Pac. Med. Ctr.*,
  19 F.3d 449 (9th Cir. 1994) .............................................................................. 42, 43, 44, 45

*Mission Foods*,
  350 NLRB 336 (2007) .................................................................................................... 27

*More Truck Lines, Inc.*,
  336 NLRB 772 [2001] ..................................................................................................... 30

*Muffley v. Spartan Mining Co.*,
  570 F.3d 534 (4th Cir. 2009) ................................................................................... 44, 45

*NLRB v. Acme Industrial Co.*,
  385 U.S. 432 (1967) ........................................................................................................ 35

*NLRB v. Allied Prod. Corp.*,
  548 F.2d 644 (6th Cir. 1977) ......................................................................................... 26

*NLRB v. AutoNation, Inc.*,
  801 F.3d 767 (7th Cir. 2015) ......................................................................................... 30

*NLRB v. Brown*,
  380 U.S. 278 (1965) ........................................................................................................ 23

*NLRB v. Daily News of Los Angeles*,
  73 F.3d 406 (D.C. Cir. 1996) .................................................................................... 26, 28

*NLRB v. Detroit Edison Co.*,
  440 U.S. 301 (1979) ........................................................................................................ 35

*NLRB v. E. Bay Auto. Council*,
  483 F.3d 628 (9th Cir. 2007) .................................................................................... 29, 40

*NLRB v. Eads Transfer, Inc.*,
  989 F.2d 373 (9th Cir. 1993) ......................................................................................... 22

*NLRB v. El Paso Elec. Co.*,
  681 F.3d 651 (5th Cir. 2012) ......................................................................................... 35

*NLRB v. Electro-Voice, Inc.*,
  83 F.3d 1559 (7th Cir. 1996) ......................................................................................... 43

*NLRB v. Erie Resistor Corp.*,
  373 U.S. 221 (1963) .................................................................................................. 21, 22

*NLRB v. Federated Logistics & Operations, Inc.*,
  400 F.3d 920 (D.C. Cir. 2005) ....................................................................................... 30

Page iii          Memorandum of Points and Authorities In Support of Temporary Injunction

*NLRB v. Fort Vancouver Plywood Co.*,
   604 F.2d 596 (9th Cir. 1979) ................................................................................. 30

 *NLRB v. Gilmore Steel Corp.*,
   1989 WL 435373 (9th Cir. Oct. 17, 1989) .............................................................. 29

*NLRB v. Great Dane Trailers, Inc.*,
   388 U.S. 26 (1967) .................................................................................................. 21

*NLRB v . Hecla Min. Co.*,
   564 F.2d 309 (9th Cir. 1977) ................................................................................. 30

*NLRB v. Hertzka & Knowles*,
   503 F.2d 625 (9th Cir. 1974) ................................................................................. 30

*NLRB v. K-Mart Corp.*,
   626 F.2d 704 (9th Cir. 1980) ................................................................................. 36

*NLRB v. Kaiser Engineers*,
   538 F.2d 1379 (9th Cir. 1976) ............................................................................... 22

*NLRB v. Katz*,
   369 U.S. 736 (1962) .......................................................................................... 23, 26

*NLRB v. L'Eggs Prod., Inc.*,
   619 F.2d 1337 (9th Cir. 1980) ............................................................................... 30

*NLRB v. Lantz*,
   607 F.2d 290 (9th Cir. 1979) ................................................................................. 30

*NLRB v. Loomis Courier Serv., Inc.*,
   595 F.2d 491 (9th Cir. 1979) ................................................................................. 21

*NLRB v. Los Angeles Marine Hardware Co., Div. of Mission Marine Assocs.*,
   602 F.2d 1302 (9th Cir. 1979) ............................................................................... 21

*NLRB v. May Dep't Stores Co.*,
   326 U.S. 376 (1945) ................................................................................................ 40

*NLRB v. Queen Mary Restaurants Corp.*,
   560 F.2d 403 (9th Cir. 1977) ................................................................................. 36

*NLRB v. Santa Fe Drilling Co.*,
   416 F.2d 725 (9th Cir. 1969) ................................................................................. 30

*NLRB v. Seattle-First Nat. Bank*,
  638 F.2d 1221 (9th Cir. 1981) ........................................................................... 38

*NLRB v. Stanislaus Imp. & H. Co.*,
  226 F.2d 377 (9th Cir. 1955) ............................................................................. 36

*NLRB v. Transmart, Inc.*,
  117 F.3d 1421 (6th Cir. 1997) ........................................................................... 32

*NLRB v. Transp. Mgmt. Corp.*,
  462 U.S. 393 (1983) ..................................................................................... 24, 33

*NLRB v. Sw. Forest Indus.*,
  841 F.2d 270 (9th Cir. 1988) ............................................................................. 40

*NLRB v. Traction Wholesale Center Co., Inc.*,
  216 F.3d 92 (D.C. Cir. 2000) ............................................................................. 32

*NLRB v. Truitt Mfg. Co.*,
  351 U.S. 149 (1956) .......................................................................................... 35

*NLRB v. Ultra-Sonic De-Burring Inc, of Texas*,
  593 F.2d 123 (9th Cir. 1979) ............................................................................. 42

*NLRB v. W. Coast Casket Co.*,
  469 F.2d 871 (9th Cir. 1972) ............................................................................. 37

*NLRB v. Gissel Packing Co.*,
  395 U.S. 575 (1969) .......................................................................................... 30

*Overstreet v. El Paso Disposal, L.P.*,
  625 F.3d 844 (5th Cir. 2010) ............................................................................. 45

*Overstreet v. Thomas Davis Med. Ctrs., P.C.*,
  9 F. Supp. 2d 1162 (D. Ariz. 1997) ................................................................... 40

*Pascarell v. Vibra Screw, Inc.*,
  904 F.2d 874 (3d Cir. 1990) .............................................................................. 44

*Portland Willamette Co. v. NLRB*,
  534 F.2d 1331 (9th Cir. 1976) ..................................................................... 22, 41

*Pye v. Excel Case Ready*,
  238 F.3d 69 (1st Cir. 2001) ............................................................................... 41

*Rubin v. Grill Concepts Servs., Inc.*,
    2023 WL 334017 (9th Cir. Jan. 20, 2023)......................................................................... 28

*Rubin v. Vista Del Sol Health Servs., Inc.*,
    80 F. Supp. 3d 1058 (C.D. Cal. 2015) .............................................................................. 45

*Scott v. Stephen Dunn & Assoc.*,
    241 F.3d 652 (9th Cir. 2001) ............................................................................... 4, 39, 43

*Shattuck Denn Mining Co. v. NLRB*,
    362 F.2d 466 (9th Cir. 1966) ........................................................................................... 32

*Small v. Avanti Health Systems, LLC*,
    661 F.3d 1180 (9th Cir. 2011) .................................................................................. Passim

*Small v. So. Cal. Permanente Med. Group*,
    2010 WL 5509922 (C.D. Cal. 2010) ............................................................................... 40

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024)........................................................................................ 3, 4, 20, 44

*United Food & Com. Workers Int'l Union v. NLRB*,
    998 F.2d 7 (D.C. Cir. 1993)............................................................................................. 28

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ......................................................................................................... 20

*Winter v Natural Resources Defense Council*,
    555 U.S. 7 (2008) .............................................................................................. 4, 20, 39, 43

**NLRB CASES**

*A & L Underground*,
    302 NLRB 467 (1991).................................................................................................... 29

*Advertiser's Mfg. Co.*,
    280 NLRB 1185 (1986).................................................................................................... 34

*Aeolian Corp.*,
    247 NLRB 1231 (1980).................................................................................................... 36

*Arc Bridges, Inc. (Arc Bridges I)*,
    355 NLRB 1222 (2010).................................................................................................... 22

*Austal USA, LLC*,
    356 NLRB 363 (2010)...................................................................................................... 31

*Butcher Boy Refrigerator Door Co.*,
  127 NLRB 1360 (1960)........................................................................................... 36

*Capitol Steel & Iron Co.*,
  317 NLRB 809 (1995)............................................................................................. 36

*Central Maine Morning Sentinel*,
  295 NLRB 376 (1989)....................................................................................... 27, 28

*Chinese American Planning Council*,
  307 NLRB 410 (1992)............................................................................................. 29

*Cincinnati Truck Center*,
  315 NLRB 554 (1994)............................................................................................. 32

*Concepts & Designs*,
  318 NLRB 948 (1995)............................................................................................. 31

*Covanta Energy Corp.*,
  356 NLRB 706 (2011)....................................................................................... 22, 25

*Daily News of Los Angeles*,
  315 NLRB 1236 (1994)........................................................................................... 28

*Disneyland Park*,
  350 NLRB 1256 (2007)........................................................................................... 35

*Eastern Maine Medical Center*,
  253 NLRB 224 (1980)....................................................................................... 22, 25

*Ferguson Enterprises, Inc.*,
  349 NLRB 617 (2007)............................................................................................. 34

*First Student, Inc.*,
  359 NLRB 208 (2012)............................................................................................. 30

*Flambeau Airmold Corp.*,
  334 NLRB 165 (2001)....................................................................................... 34, 35

*Fleming Co.*,
  332 NLRB 1086 (2000)........................................................................................... 35

*Garrison Valley Center, Inc.*,
  246 NLRB 700 (1979)............................................................................................. 34

*Greco & Haines, Inc.*,
    306 NLRB 634 (1992) ................................................................................................ 32

*Flamingo Las Vegas Operating Co.*,
    360 NLRB No. 41, slip op. at 2 (2014) ..................................................................... 25

*Intertape Polymer Corp.*,
    372 NLRB No. 133, slip op. at 6-7 (2023) ........................................................ 24, 32

*Jensen Enterprises*,
    339 NLRB 877 (2003) ............................................................................................... 30

*John Morrell & Co.*,
    304 NLRB 896 (1991) ............................................................................................... 28

*King Soopers, Inc.*,
    340 NLRB 628 (2003) ............................................................................................... 34

*KNTV, Inc.*,
    319 NLRB 447 (1995) ............................................................................................... 33

*Lucky Cab Company*,
    360 NLRB 271 (2014) ............................................................................................... 32

*ManorCare Health Services – Easton*,
    356 NLRB 202 (2010) ............................................................................................... 32

*Mid-Mountain Foods*,
    332 NLRB 251 (2000) ............................................................................................... 32

*Oregon Steel Mills*,
    291 NLRB 185 (1988) ............................................................................................... 29

*Overnite Transportation Co.*,
    296 NLRB 669 (1989) ............................................................................................... 38

*Pepsi-Cola Bottling Co.*,
    315 NLRB 882 (1994) ............................................................................................... 34

*Pontiac Osteopathic Hospital*,
    336 NLRB 1021 (2001) ............................................................................................. 35

*Postal Service*,
    308 NLRB 547 (1992) ............................................................................................... 36

Page viii        Memorandum of Points and Authorities In Support of Temporary Injunction

*Professional Transportation, Inc.*,
　362 NLRB 534 (2017) ................................................................................................. 37

*Rood Trucking Company, Inc.*,
　342 NLRB 895 (2004) ................................................................................................. 33

*Rural/Metro Medical Services*,
　327 NLRB 49 (1998) ................................................................................................... 27

*Saginaw Control & Engineering, Inc.*,
　339 NLRB 541 (2003) ................................................................................................. 29

*Shell Oil Co.*,
　77 NLRB 1306 (1948) ................................................................................................. 26

*St. John's Community Services-New Jersey*,
　355 NLRB 414 (2010) ................................................................................................. 34

*United Aircraft Corp.*,
　199 NLRB 658 (1972) ................................................................................................. 22

*United States Postal Service*,
　341 NLRB 684 (2004) ................................................................................................. 34

*Valley Inventory Service, Inc.*,
　295 NLRB 1163 (1989) ............................................................................................... 36

*Wells Fargo Armored Services Corp.*,
　322 NLRB 616 (1996) ................................................................................................. 32

*West Coast Casket Co.*,
　192 NLRB 624 (1971.) ................................................................................................ 37

*West Penn Power Co.*,
　339 NLRB 585 & fn. 9 ................................................................................................ 36

*Windsor Redding Care Center, LLC*,
　366 NLRB No. 127 (2018) .......................................................................................... 27

*Wright Line*,
　251 NLRB 1083 (1980) .................................................................................. 24, 27, 32

**STATUTES**

28 U.S.C. §1391(b)(c)........................................................................................................ 2

28 U.S.C. §1657(a) ........................................................................................................... 2

29 U.S.C. §157.......................................................................................................... 3, 21, 29

29 U.S.C. §158............................................................................................................... 37

29 U.S.C. §158(a)(1) (3), and (5)........................................................................................ 1

29 U.S.C. §160(b) ............................................................................................................ 28

29 U.S.C. §160(j) ......................................................................................................... 1, 3

Page x          Memorandum of Points and Authorities In Support of Temporary Injunction

## I.     STATEMENT OF THE CASE

This proceeding is before the Court on a petition filed by the Regional Director of Region 20 of the National Labor Relations Board (the Board), pursuant to §10(j)[1] of the National Labor Relations Act, as amended [29 U.S.C. §160(j)] (the Act), for a temporary injunction pending final disposition of the unfair labor practice allegations presently pending before an Administrative Law Judge of the Board on a Third Amended Consolidated Complaint in Board Cases 20-CA-315531, 20-CA-316334, 20-CA-321160, 20-CA-322476, 32-CA-322804, 20-CA-327603, 32-CA-327746, 32-CA-327820, and 32-CA-327847 (the Consolidated Complaint) (Exh. C)[2] issued by the Regional Director of Region 20 on March 25, 2024 and on a Complaint in Board Case 20-CA-340738 (the Second Complaint) (Exh. E) issued by the Acting Regional Director of Region 20 on September 16, 2024. The Consolidated Complaint and Second Complaint (the Complaints), based upon the unfair labor practice charges (Exh. D1-D27, F, H ) filed by the Union,  allege that Satellite Healthcare, Inc. (Respondent or Employer) violated §8(a)(1), (3), and (5) of the Act. [29 U.S.C. §158(a)(1) (3), and (5)] at facilities where Respondent's employees selected a union as their

---

[1] Section 10(j) provides: The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States District Court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper. 29 U.S.C. §160 (j).

[2] Reference to exhibits filed with this Court in support of the Memorandum of Points and Authorities (Memorandum) shall be made as follows: "Exh. ___." Memorandum Exhibits A – G are identical to Petition for Injunction (Petition) Exhibits A - G , which are attached to the Petition.

Page 1          Memorandum of Points and Authorities in Support of Temporary Injunction

collective-bargaining representative. As Petitioner is seeking temporary injunctive relief, this matter warrants expedited consideration by the Court pursuant to 28 U.S.C. §1657(a).[3]

On July 8 – 12 and August 12 – 13, 2024, the allegations of the Consolidated Complaint were fully litigated before Administrative Law Judge Brian Gee (the ALJ).[4] The allegations in the Second Complaint are scheduled to be litigated before an Administrative Law Judge on March 18, 2025, and consecutive dates as necessary, until the hearing is completed.  Petitioner submits that there is a high likelihood she will prevail before the Board on the merits of the Complaints by establishing that Respondent committed the following unlawful labor practices in violation of §8(a)(1), (3), and (5) of the Act: eliminated Union represented employees' merit wage increases in 2023 and 2024 based on anti-Union motives; eliminated represented employees 2023 wage increase and implemented harsher time and attendance restrictions without giving the Union proper notice and opportunity to bargain; repeatedly delayed and cancelled initial bargaining sessions with the Union; failed to promptly provide relevant information requested by the Union

[3]  The United States District Court, Northern District of California is the proper venue since many of Respondent's facilities at issue in this case are located in San Francisco, San Leandro, Milpitas, Rohnert Park, Watsonville, San Jose, Gilroy, and Morgan Hill, California, which fall within Northern District. See 28 U.S.C. §1391(b)(c).

[4] The transcript of the hearing before the ALJ is attached to the Memorandum as Exhibit H and shall be referred to as "Tr." followed by the corresponding transcript page numbers (i.e., "Tr. #.") The parties' Joint Exhibits, General Counsel's Exhibits, Respondent's Exhibits, and the Charging Party Exhibits received into evidence by the ALJ are attached to the Memorandum as Exhibits I, J,  K, and L, respectively. References to exhibits received into the record before the ALJ shall be made as follows - JT Ex., GC Ex., R Ex., and CP Ex. – followed by the corresponding internally paginated number if necessary (i.e., "GC Ex. 9:5-6.)

The Affidavits of the following individuals and their corresponding date of signature are attached to the Memorandum as - Exh. M (Jonathan Kim, April 30, 2024); Exh. N (Albert Li, November 9, 2023); Exh. O (Mike Badilla, May 8, 2024); Exh. P (Mike Badilla, May 14, 2024); Exh. Q and R (Eugene De La Pena, May 22, 2024); Exh. S and T (Nealsen "Easen" Pe Benito, May 16, 2024); Exh. U (Raymond Berdos, August 1, 2024); Exh. V (Noelani Escovilla, June 17, 2024); Exh. W (Katherine Nies, May 23, 2024); Exh. X (Jason Capell, April 23, 2024); and Exh. Y (Eleni Johnson, September 12, 2023) – followed by the corresponding internally paginated number if necessary (i.e., "Exh M:2").

for bargaining purposes; and made numerous statements that would tend to coerce a reasonable employee's exercise of their Section 7 rights.

Such restraint is necessary now to prevent the irreparable harm likely to result from Respondent's multitude of violations and preserve the employees' fundamental right under §7 of the Act "to bargain collectively through representatives of their own choosing" and to prevent Respondent from benefitting from its unlawful action by ignoring its employees' choice. 29 U.S.C. §157. The injunction, if granted, would only be in place until the Board orders a final remedial order because the purpose of such an injunction is to preserve the Board's remedial authority, and to prevent Respondent from achieving its unlawful objective in the meantime. The Board's proceedings likely will not conclude for a period of a year or more, and Congress added §10(j) to the Act to provide a mechanism for avoidance of the irreparable harm attendant to such delay in appropriate cases, such as this one.

## II.    THE STATUTORY SCHEME

Section 10(j) of the Act,[5] authorizes federal district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. As the Supreme Court has stated, because "the Board's administrative proceedings take years, Congress vested the Board with authority to seek a preliminary injunction in federal court while the proceedings unfold" since in many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, thereby rendering a final Board order ineffectual.[6] Thus, §10(j) was intended to prevent the potential frustration or nullification of the

---

[5] 29 U.S.C. §160(j)

[6] *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1574 (2024). *See Chester v. Grane Healthcare Co.*, 666 F.3d 87, 92-93 (3d Cir. 2011) (citing S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), *reprinted at*, *I Legislative History of the Labor Management Relations Act of 1947* 414,

Board's remedial authority caused by the passage of time inherent in Board administrative litigation. "The court must evaluate the traditional equitable criteria through the prism of the underlying purpose of §10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power."[7]

The Supreme Court, in *Starbucks v. McKinney*,[8] recently held that in considering a request for a temporary injunction under §10(j), the district courts must apply the traditional four-factor test set forth in *Winter v. Natural Resources Defense Council, Inc.*[9] Therefore, the Board must establish: 1) a likelihood of success on the merits; 2) a likelihood of irreparable harm in the absence of preliminary relief; 3) a balance of equities in the Board's favor; and 4) that an injunction is in the public interest.[10]

## III.    STATEMENT OF FACTS

Respondent is a California non-profit corporation engaged in the business of providing dialysis services at about 60 clinics in California. (Tr. 318, 338, 391, 485, 621.) In 2022, SEIU-United Healthcare Workers West (the Union) began organizing various technicians at the Employer's dialysis clinics located in California.  In late December 2022, employees elected the Union to be their collective bargaining representative at four Respondent clinics: Gilroy, Morgan

---

433 (Government Printing Office 1985)). *See also Hoffman v. Inn Credible Caterers*, 247 F.3d 360, 368 (2d Cir. 2001) ("[o]ne of the underlying purposes of [§]10(j) is to preserve the status quo in order to protect employees' statutory collective bargaining rights.").

[7] *Frankl v. HTH Corp.*, 650 F.3d 1344, 1355 (9th Cir. 2011) (quoting *Scott v. Stephen Dunn & Assoc.*, 241 F.3d 652, 661 (9th Cir. 2001)).

[8] *Starbucks Corp.*, 144 S.Ct. at 1576.

[9] 555 U.S. 7 (2008).

[10] *Starbucks Corp.,* 144. S.Ct. at 1576.

Hill, San Francisco, and Blossom Valley.[11] (Tr. 36, 621.) The Union's organizing campaign continued and throughout 2023 and into 2024, the Union became the certified collective bargaining representative for employees at the following additional Respondent clinics/facilities on the following dates: (Tr. 69, 195; Exh. Z.)

| Date Employees Voted for Union Representation | Facility |
|---|---|
| May 1, 2023. | Vallejo, California |
| June 26, 2023 | Milpitas, California |
| July 27, 2023 | Folsom, California |
| August 2, 2023 | Rohnert Park, California |
| October 23, 2023 | Santa Teresa, California |
| December 1, 2023 | San Leandro, California |
| March 2, 2024 | Watsonville, California |

### A.    Annual Merit Wage Increases.

For at least two decades before 2023,[12] Respondent's established practice was to give workers an annual performance evaluation and accompanying annual merit wage increase in March or April every year.[13] (Exh. W:3-4, U:1, V:1; Tr. 218--222, 321, 339, 349-351, 356, 489-491, 517-519, 623, 656, 751, 756, 759-760, 772, 819-820, 907, 967; GC Ex. 49:6, 54; R Ex. 33-35; JT Ex. 1.) Indeed, Respondent does not dispute that the annual merit wage increases were

---

[11] Located at1450 Kooser Road, San Jose, CA 95118.

[12] All years refer to the year 2023 unless otherwise noted.

[13] A worker's performance evaluation was based on their work from the prior calendar year. For example, Respondent gave workers an evaluation in March of 2023 based on their work performance during the year 2022. (Tr. 909-910, 349, 518-519.)

Page 5          Memorandum of Points and Authorities in Support of Temporary Injunction

given to workers "every year at the same time." (Tr. 751; JT Ex. 1.) While the percentage amount of these merit wage increases varied slightly depending on an employee's performance evaluation, virtually all employees received a pay increase each year.[14] (Tr. 218-219, 321, 351, 356, 489-491, 517-520, 772-773, 915, 920-921, 967; GC Ex. 28:4-6, 25-28; JT Ex. 1.)

Each year, Respondent trained its managers on how to properly calculate employees' annual merit wage increases, providing specific guidelines in a document called the "Deck" on determining the increase an individual employee should receive.[15] (Tr. 649, 651, 653, 757-758, 825, 911-913, 915-916; GC Ex. 54; R Ex. 33-35.) The Deck directed managers to use an employee's "Compa-Ratio," an employee's pay rate divided by a midpoint representative of the market median, and their performance rating to determine their merit wage increase.  (Tr. 656. 665, 659, 762+766, 806-807, 865, 868, 909, 913, 917; GC Ex. 54:5,6; R Ex. 33:17-19, 25, 34:5-7, 35:5-7.) These slides in the Deck gave several detailed examples instructing managers on how to determine an employees' merit wage increase using these two factors. For instance, an employee who was rated "Exceeded Expectations" and had a "Compa-Ratio" of 90% would receive a 3% wage increase, whereas an employee who was "Meeting Expectations" and had a "Compa-Ratio" of 100% would receive a 2.5% increase. (Tr. 666, 682, 764-765, 826, 919; GC Ex. 54:7.) Clinical Manager Mary Ann Mercado testified that she relied upon her evaluation of

---

[14] For example, Mike Badilla, who formerly served as an Assistant Manager at Gilroy, testified that he asked his superior if he could give poorly performing employees a 0% raise and was told that each employee should receive at least a 1% percent raise. (Tr. 354.) Similarly, former Gilroy Clinical Manager Mary Ann Mercado testified that during her three years at that facility, she never gave an employee a 0% raise, but rather that she "always gave them something." (Tr. 915.)

[15] The Deck from each year contained some slight variations but were essentially the same substantively. (GC Ex. 54; R Ex. 33-35.) About a month before conducting worker evaluations, Respondent trained its managers on the timelines and guidelines contained in the Deck. (Tr. 652, 806, 824, 911.)

Page 6         Memorandum of Points and Authorities in Support of Temporary Injunction

an employee's performance and their "Compa-Ratio" when determining their annual merit wage increase and did not consider other factors. (Tr. 867-868.)

In late December 2022, employees at Respondent's Gilroy, Morgan Hill, San Francisco, and Blossom Valley clinics selected the Union as their exclusive collective-bargaining representative. (Tr. 36, 621.)

On March 6, Respondent emailed its managers stating that its counsel was drafting a letter that would be sent to Union represented employees at the Gilroy, Morgan Hill, San Francisco, and Blossom Valley clinics informing them that they were not going to receive their customary annual merit wage increase until Respondent reached a collective-bargaining agreement with the Union. (GC Ex. 36.)

On March 20, Respondent sent the Union letters stating that "no decisions" had been made regarding any wage increases for Union represented employees at the Gilroy, Morgan Hill, San Francisco, and Blossom Valley clinics, and "[t]his may impact when and how a represented employee is informed about a wage increase they are going to receive." (GC Ex. 4.) The following day, Respondent sent a similar letter to Union represented employees, promising to bargain in good faith with the Union and keep them updated when it had more information. (R Ex. 50, 64, 78.)

In the latter half of March, Respondent issued employee evaluations and annual merit wage increases, but only for its unrepresented employees.  (Tr. 188, 323, ; JT Ex. 1.) Starting in April, Union represented employees began questioning Respondent about why they were not receiving their 2023 wage increase, on which they had come to depend.  (Tr. 321-323, 363-364, 495, 501, 525-526.) The Union did not learn about Respondent's elimination of the merit wage increases until about April or May, when employees informed the Union about it. (Tr. 108, 625.)

Page 7        Memorandum of Points and Authorities in Support of Temporary Injunction

Respondent gave the Union no notice or opportunity to bargain before eliminating the long-standing annual wage increase. (Tr. 108-109, 624-627.)

Respondent made certain that Union-represented employees at the Gilroy, Morgan Hill, San Francisco, and Blossom Valley clinics knew it was their choice to unionize that had cost them their merit wage increases. (Tr. 323, 356, 363-364, 493-495, 501, 522-526, 816, 953, 959; GC Ex. 35, 42; JT Ex. 1.)  When employees asked their managers, Respondent quickly blamed the lack of raises on the employees' choice to unionize. Specifically, in early June, when Union represented employees at Respondent's San Francisco facility asked about their merit wage increases, Clinical Manager Sally Tesorero told them that there would be none and lamented that because the employees had unionized and the parties needed to bargain, there was nothing Respondent could do, and the employees would not receive raises that year. (Tr. 495.) During a team meeting around the same time, employees at the Blossom Valley facility asked whether they would receive their merit wage increases, since they had been directed to sign their performance evaluations. (Tr. 524-526.) Manager Paula Luong told them they would not receive any wage increases because they had to wait for bargaining. (*Id.*) The next day, when other employees brought up the issue in another team meeting, Luong gave the same response. (*Id.*)

On about July 30, when Morgan Hill technician Eric Del Campo received his performance evaluation, he asked Clinic Manager Mildred Peralta if he would get a corresponding wage increase. (Tr. 323.) Peralta responded that raises would not be given out until the Union and Respondent agreed on a collective-bargaining agreement. (*Id.*) In late August, San Francisco's Director of Operations David Baba repeated that management had been rendered helpless by the employees' decision to unionize and that raises would not be forthcoming so long as the parties were in the process of bargaining. (Tr. 501.)

With the passage of time, employees became increasingly frustrated by Respondent acting unlawfully with apparent impunity. At facilities where Respondent withheld the 2023 annual merit wage increases, employees' disaffection has become particularly salient. When the Union held a two-day strike on September 25-26, only five out of eleven employees from the San Francisco facility and only two out of the five employees from the Blossom Valley facility participated. (Exh. M:1.) Additionally, after Respondent discontinued the 2023 annual merit wage increases for Union represented employees, the lone employee member of the Union's Morgan Hill bargaining committee resigned, and all other employees declined to join the committee. (Exh. M:2.) Moreover, after Respondent eliminated the wage increase, the unit at Blossom Valley shrank from seven employees to five, while the San Francisco unit dropped from seventeen to ten, as employees were forced to find other jobs to keep up with the rising cost of living. (*Id.*)

On October 5, the Union filed an unfair labor practice charge over Respondent's unilateral refusal to grant the annual merit wage increase and requested bargaining over the change. (Exh. F.) Respondent responded that it considered this demand to bargain to be an attempt to settle a legal claim, i.e., the unfair labor practice charge, and therefore it was not a sufficiently "clear" demand to bargain. (Exh. AA:3; Tr. 24.) During a bargaining session and email in December, Respondent informed the Union that it would be conducting employee performance evaluations for unit employees in April 2024 but did not mention annual merit wage increases. (Exh. X:1-2.; R Ex. 58.)

In the meantime, the Union was selected by a majority of employees at additional Respondent clinics and was certified by the Board as the collective bargaining representative for those employees on the following dates: (Exh. Z:1-2; Tr. 83; GC Ex. 12.)

Page 9    Memorandum of Points and Authorities in Support of Temporary Injunction

On March 13, 2024, the parties held an in-person bargaining session that included Union Representative Capell, bargaining committee member Badilla, Respondent's attorneys Tom Davis and Erin Sweeney, and a representative from Respondent's Human Resources Department. (Exh. X:1-2.) Capell requested that Respondent issue the upcoming 2024 merit wage increases to unit employees, but Davis stated that Respondent could not legally do so and asked the Union to provide a counterproposal. (Exh. X:1-2.) Capell offered to provide a written waiver of the Union's right to bargain so that the 2024 merit wage increases could be implemented, but Davis rejected that offer. (Exh. X:1-2.) On March 29, Respondent's attorney Davis emailed Capell proposing that Respondent pause merit wage increases until the parties finished bargaining over the Union's broader economic proposal. (R Ex. 61.) Davis specifically rejected the Union's proposal that it issue the 2024 annual merit wage increases to unit employees. (*Id.*)

As in 2023, Respondent eliminated merit increases in 2024 for only employees represented by the Union and managers made certain that employees knew it was their choice to unionize that had cost them their merit wage increases. (Exh. P:1, R:2, T:1-2, U:2, V:2, W:2, X:2.)

On April 18, 2024, US Renal and Respondent held a town hall meeting for employees at an event venue in Elk Grove, California. (Exh. V:2-3.) When management opened the floor to questions, Nurse Noelani Escovilla, who worked at the Folsom facility, asked why employees were not receiving 2024 merit wage increases. (*Id.*) US Renal Representative Ana Silveira responded that it had become a part of the bargaining process and reminded employees that the

Page 10          Memorandum of Points and Authorities in Support of Temporary Injunction

Respondent had told them this would happen.[16] (*Id.*) When employee Badilla received his performance evaluation, the Gilroy Clinical Manager said Badilla was an exemplary employee but would not be receiving a merit wage increase because the facility was unionized. (Exh. P:1.) Similarly, when employee Nealsen Pe Benito received his 2024 performance evaluation, Blossom Valley Clinical Manager Joanne Antonio stated that because of bargaining, she was unable to give him a raise or comment further. (Exh. T:1.) Around the same time, San Leandro employee Raymond Berdos, who was on the bargaining team, asked why employees at the facility did not receive the 2024 merit wage increases. (Exh. U:2.) San Leandro Clinical Manager Zafirah Nisha explained that since bargaining was happening, the company had frozen merit wage increases. (*Id.*)

The lack of merit wage increases in April 2024—for some facilities, the second year in a row with no pay increases—had a profound damaging effect on employee morale and Union support. Social Worker Katherine Neis, an employee at Rohnert Park, testified that annual merit wage increases after performance evaluations was the status quo for many years and Respondent's contrary claim felt "purely like retaliation" against unionized clinics. (Exh. W:2.) She observed that many people were getting frustrated and burnt out and believed they were considering leaving the Rohnert Park facility because of the lack of merit wage increases. (*Id.*) Technician Eugene De La Pena also testified that many employees at the San Francisco facility were leaving or transferring to non-unionized clinics because they were frustrated by the lack of wage increases. (Exh. Q:1.) At Folsom, Escovilla testified that Respondent's withholding of merit wage increases was a form of retaliation aimed at discouraging employees from supporting

---

[16] Although the exact relationship between US Renal and the Employer is unclear in terms of liability under the Act, the Region has found that US Renal representatives often speak as agents of the Employer regarding the unit employees' terms and conditions of employment.

the Union. (Exh. V:3.) She believed Respondent was trying to frustrate and overwork unit members until they either quit or employees try to oust the Union. (*Id*:3-4.) As part of his role on the San Leandro bargaining committee, Berdos explained to his coworkers the benefits of bargaining. (Exh. U:2.) However, he testified that employees who used to support the Union have retreated from their previous open support because they are afraid of facing retaliation. (*Id.*) Badilla testified that the continued lack of merit wage increases has demoralized the unit at Gilroy. (Exh. O:1.) He testified that employees are becoming increasingly frustrated, especially as rumors spread that Respondent will simply keep filing legal challenges, and it will take years before the case is decided and employees receive the raises they are owed. (*Id*:1-2.)

Employee testimony also shows that Respondent is withholding annual merit wage increases at unionized clinics to discourage organizing at its other facilities. Blossom Valley Technician Pe Bonito testified that he has been involved in trying to organize other facilities but that employees at these facilities avoid him because they heard that clinics like Blossom Valley lost their raises because they unionized. (Exh. S:1-2.) This sentiment, according to Pe Bonito, that unionizing does more harm than good, has spread to other clinics such as those at Bascom, White Road, and Mountain View. (*Id.*) Similarly, Badilla testified that he heard that management has been withholding merit wage increases to discourage nonunionized clinics from organizing by pointing out that, if they went Union, they would not get raises and litigation over the issue would take years to get resolved. (Exh. O:1-2.)

Several prominent Union supporters, such as initial organizers and bargaining committee members, now fear that Respondent is looking for opportunities to get rid of them. De La Pena testified that he believes his manager now raises issues about him with Human Resources more quickly than in the past because De La Pena is an open Union leader, and his manager wants to

Page 12          Memorandum of Points and Authorities in Support of Temporary Injunction

create a paper trail to build a case against him. (Exh. Q:2.) Similarly, Pe Bonita testified that he is concerned about his position as a member of the bargaining committee at Blossom Valley because bargaining committee members must work extra hours to cover their full schedule, and the Employer has begun cracking down on employees who do not either work or find coverage for all their hours. (Exh. S:2-3.) Gilroy bargaining committee member Badilla testified that his pro-Union activity has put a target on his back and, if he is terminated in the future, it will be because he was a Union leader. (Exh. O:2.) At his performance evaluation, the Gilroy Clinical Manager mentioned that Badilla's name came up at meetings and that she guessed that Badilla knew why. (Exh. O:3.) After the Folsom facility unionized, Escovilla's manager began insisting she arrive at specific, predetermined times each day, eliminating the scheduling flexibility Escovilla previously enjoyed. (Exh. V:4.)

B.    **Respondent's Unlawful Actions at the Vallejo Clinic.**

Registered Nurse Cathy Mendoza worked at various Respondent facilities from 2017 until her June 17 termination from the Vallejo clinic. (Tr. 134-135.) She was a very active member of the Union's organizing committee. (Tr. 142, 609.) On March 10, three members of the Vallejo Organizing Committee, Marc Calma, Dennis Torres, and Cathy Mendoza, delivered a letter[17] expressing their interest in unionizing to Clinical Manager Myrna Hernandez. (Tr. 134, 142, 144-145, 531-532, 573-574, 576, 579, 608-609; GC Ex. 26.) Hernandez expressed doubt that Respondent could meet the Union's demands, saying she hoped Vallejo would not be forced to close but had heard other clinics might. (Tr. 148-149, 576.) Pointing to a post-it note with a name written on it, Manager Hernandez told Calma, Torres, and Mendoza that a manager at

---

[17] The letter was signed by 11 employees, out of about 25, and included their photographs. (GC Ex. 26.)

Page 13        Memorandum of Points and Authorities in Support of Temporary Injunction

another clinic had warned her not to hire that person if they applied at Vallejo because they were a Union supporter. (Tr. 146, 535-536, 576-577.) She cautioned that other clinics might not hire employees whose names and faces were on the Organizing Committee letter because they had revealed themselves as known Union supporters. (Tr. 145-147, 535, 576 -577.) Hernandez singled out Mendoza in particular, saying she knew where Mendoza stood. (Tr. 150, 554, 576.) Later that day, Hernandez texted Mendoza to tell her that she knew about the financial status of Respondent and did not know if it could grant the Union's demands. (Tr. 164; GC Ex. 22:2, 4.) Hernandez pointed out that three clinics had already closed, and the Employer was not as big as its competitors.(Tr. 165-166; GC Ex. 22: 7.)  Remarking that she had been gracious about Mendoza arriving late to her shift in the past, Hernandez implied that things might soon change. (Tr. 174-176; GC Ex. 22: 18-19.)

On March 21, Respondent followed through on Clinical Manager Hernandez's earlier threat to Mendoza by issuing her four write-ups for having been late to her shifts on March 1, 2, 7, and 10. (Tr. 164, 176-178; GC Ex. 18.) Mendoza received only verbal warnings when she had arrived late on those days, but these were converted into write-ups after she helped deliver the Organizing Committee letter. (*Id.*) During her employment, Mendoza was frequently late but, until March 21, had received only verbal warnings. (Tr. 187-189.) She contacted Union Representative Eleni Johnson, telling her about the write-ups and explaining that Respondent did not normally issue four of them at once. (Tr. 181-182, 610.) On March 25, Respondent replaced the four write-ups with a first written warning, purportedly in accordance with its policies. (Tr. 185-187, 612; GC Ex. 19.) When Mendoza received her performance appraisal on March 28, Hernandez told her that, because of her tardiness, Respondent could not give Mendoza a good performance rating or a high wage increase. (Tr.188-189.) Hernandez chided Mendoza for

involving the Union in the matter, saying Respondent would not have had to issue the first written warning if Mendoza had not gone to the Union over the four write-ups. (*Id.*) On April 4, Mendoza received a final written warning for tardiness. (Tr. 190-193; GC Ex. 21.)

On about May 2,[18] after a majority of the Vallejo employees voted for the Union, Clinical Manager Hernandez called a team meeting of about ten employees and announced they would have to start manually recording their lunch and afternoon breaks on a sign-in/sign-out sheet. (Tr. 198–199, 540-542, 582-583; GC Ex. 45.)

On May 5, when Respondent sent a text to employees announcing it had posted the sign-in/sign-out sheet, Hernandez texted the thread to inform employees that they could no longer clock in more than five minutes before their shifts and that clocking in one minute after a shift began would now be considered late. (Tr. 201-202; GC Ex. 22:2.) That same day, Hernandez repeated the same directive to workers via email. (GC Ex. 45; R Ex. 13.)

On May 9, employee Mendoza mistakenly sent a message to a text group that she believed only consisted of employees, but the group included Manager Hernandez.[19] (Tr. 204-207, 211-212; GC Ex. 23:1.) In the message, Mendoza informed workers about their right to request Union representation during meetings which they believe may lead to discipline. (*Id.*) Immediately thereafter, Hernandez called Mendoza to her office and asked why employees would get a Union representative if there was no collective-bargaining agreement yet. (Tr. 213-214.) After Mendoza said it did not matter whether there was a contract in place, Hernandez said

---

[18] As noted above, the majority of Vallejo clinic employees voted for Union representation on April 21,(Tr. 195.), and the Union was certified as the employees' bargaining representative on May 1. (Exh. BB; Tr. 195.)

[19] In her phone, Mendoza had two different text groups – one that included only her co-workers and the other included her co-workers and Manager Hernandez. (Tr. 206.)

Page 15        Memorandum of Points and Authorities in Support of Temporary Injunction

she thought employees had no right to Union representation at disciplinary meetings if they did not have a contract. (*Id.*)

On a Saturday morning in May, the timeclock was malfunctioning when Mendoza tried to clock in for her shift and employee Torres was trying to clock out for his morning break. (Tr. 587-588.) On the following Monday, Clinical Manager Hernandez called employee Torres into her office because he had witnessed Mendoza's issue with the timeclock, and Torres assured Hernandez that Mendoza had, indeed, arrived on time. (Tr. 588-589.)

On June 17, Manager Hernandez asked employee Mendoza to come to her office to meet with her and Regional Director Cruz. (Tr. 214-215.) There, Cruz told Mendoza that she was being terminated for tardiness. (*Id.*) Hernandez again admonished Mendoza for going to the Union after receiving the four write-ups in March, explaining that she was only in this situation because of it. (*Id.*)

On June 27, Hernandez called employee Torres back into her office, saying Respondent had footage proving Mendoza had been late on June 3 and accusing Torres of lying that she had not been. (Tr. 590-591.) Torres requested to have a Union representative present, but Hernandez refused, stating that employees needed a contract before they were entitled to such representation. (*Id.*) Nonetheless, Hernandez ended the questioning and Torres left. (*Id.*)

By mid-July, Union support at the Vallejo facility faltered. Union Representative Eleni Johnson found that employees who had once been very active in the organizing drive—such as technician Marc Calma, who had been a member of the Organizing Committee at Vallejo— stopped responding to her texts and calls. (Exh. Y:5-6.) When the Union organized a mixer on July 30 for employees at the Vallejo and Rohnert Park facilities, only one employee from the Vallejo facility attended. (*Id.*)

Page 16        Memorandum of Points and Authorities in Support of Temporary Injunction

**C.**    **Respondent Delayed and Cancelled Bargaining Sessions and Failed to Respond to Various Union Information Requests.**

On January 4, 2023, the Union demanded to bargain for initial collective-bargaining agreements with Respondent for unit employees at the San Francisco, Morgan Hill, Blossom Valley and Gilroy clinics and requested information related to the bargaining units at each location—such as employees' names, contact information, job classifications, wage rates, and benefits—in anticipation of bargaining.  (Tr. 37- 39; GC Ex. 2.)

On January 19, Employee Relations Manager Marcos Castellanos responded as the point of contact for each clinic. (Tr. 39- 41; GC Ex. 3.) He assured the Union that Respondent was gathering information responsive to the Union's information request, was creating its bargaining team, and was willing to meet for negotiations. (*Id.*)

On March 31, Manager Castellanos provided the Union with some of the requested information but objected to numerous items from the January 4 request. Specifically, Respondent failed and refused to provide employee identification numbers and employee pay scales/ranges. (Tr. 48- 57; GC Ex. 6:3-6; 11; R Ex. 54.)

After Respondent failed to provide the Union with all the requested information and the Union began having difficulty securing bargaining dates from Respondent, on April 4, Union Representative Jason Capell followed up with Manager Castellanos via email about setting bargaining dates.  Capell received no response. (Tr. 63; GC Ex. 7.) A couple of days later, Capell sent another email, trying to set up a call to discuss bargaining and the Union's pending information request. (Tr. 52- 60; GC Ex. 6:3-4.) On April 11, Manager Castellanos called Capell, and they discussed the composition of bargaining committees and where bargaining would take place, but Castellanos said he was not able to commit to any bargaining dates until he spoke with his labor relations team. (Tr. 65.)

Page 17         Memorandum of Points and Authorities in Support of Temporary Injunction

On April 24, Union Representative Capell again contacted Respondent and proposed initial bargaining dates of June 1, 2, 5, 8, 12, 13, 15, 16, 26, and 27. (Tr. 65; GC Ex. 8.) On May 5, Respondent finally confirmed June 27 for the parties' first bargaining session. (Tr. 71; GC Ex. 9:7-8.)

On May 3, Capell emailed Manager Castellanos demanding that Respondent bargain for an initial contract at the recently-organized Vallejo clinic and requesting information about bargaining unit employees to prepare for bargaining. (Tr. 69-71; GC Ex. 9:8-10.)

On June 14, Respondent cancelled the parties' first bargaining session, which had been scheduled for June 27. (Tr.72; GC Ex. 9:4-5.) Respondent asserted that this was necessary because it had entered into a management service agreement with U.S. Renal Care and there would be major operational and management changes. (*Id.*) Respondent proposed bargaining dates in July and August, and the Union responded that day with availability for July 24 and 25 and August 21, 22, 28, and 29. (*Id.*)

On June 21, the Union won yet another representation election, this time at Respondent's Rohnert Park facility.  (Exh. AA; Tr. 83.) The same day, Respondent finally responded to the Union's June 14 email by agreeing to meet for bargaining only on July 25. (Tr. 72; GC Ex. 9:4-5.) Immediately after, the Union began persistently prodding Respondent to agree to additional bargaining dates, and finally on July 6, Respondent agreed to meet on August 28 and 29 as well. (Tr. 73-74, 81; GC Ex. 9:3-4; 13.)

On July 11, Capell emailed Castellanos demanding that Respondent bargain for an initial contract at the recently-organized Rohnert Park clinic and requesting information about bargaining unit employees to prepare for bargaining. (Exh. AA; Tr. 83-86; GC Ex. 12.)

On July 15, Respondent cancelled the parties' bargaining sessions scheduled for July 25 and August 28 and 29. (Tr. 73-77; GC Ex. 9:1-2.) Respondent announced that, due to a family emergency, Manager Castellanos would be taking extended leave. (*Id.*) Insisting that it could not bargain in his absence, Respondent proposed the parties delay bargaining until September 18 or 19. (*Id.*) The Union agreed to bargain on both dates but protested the continued delays and cancellations. (*Id.*)

On September 18, more than eight months after the Union's initial demand to bargain and five months after the Union proposed initial bargaining dates in early April, the parties finally met for their first session; they continue to bargain for an initial contract but are nowhere near agreement. (Tr. 108.) Initial bargaining was further stymied by the fact that Respondent had not provided all the information requested by the Union until shortly before the parties' initial September 18 bargaining session. (Tr. 90-91, 96-98, 100-105, 108; GC Ex. 11; 15:1; 50.) Specifically, it was not until then that Respondent provided the employee identification numbers and pay scales/ranges for employees at the Gilroy, Morgan Hill, San Francisco, and Blossom Valley clinics as requested by the Union on January 4, as well as all of the information requested by the Union on May 3 and July 11 concerning bargaining unit employees at the Vallejo and Rohnert Park clinics, respectively. (Tr. 101-102; GC Ex. 50.)

## IV.    ARGUMENT – INTERIM RELIEF IS "JUST AND PROPER"

### A.    Petitioner has a Strong Likelihood of Success on the Merits

Likelihood of success in a §10(j) proceeding is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Petitioner occurred

and that the Circuit Court would grant a petition enforcing that order.[20] Therefore, in a §10(j) proceeding, the district court should sustain the Petitioner's factual allegations if a showing has been made that the Board "is likely to succeed on the merits."[21] However, the Petitioner need not show a certainty of winning.[22]

As discussed below, Petitioner has a strong likelihood of proving that Respondent engaged in the following unlawful actions in violation of the National Labor Relations Act (Act): 1) threatened employees and then subsequently withheld employees' 2023 and 2024 annual wage increase in retaliation to their Union activity; 2) withheld employees' 2023 annual wage increase without first giving the Union notice and an opportunity to bargain;[23] 3) implicitly threatened clinic closure and that Respondent and other dialysis companies would refuse to hire employees engaged in Union activity; 4) suggested that electing the Union was futile; 5) disciplined and terminated former employee Mendoza due to her Union activity and without first giving the Union notice and opportunity to bargain; 6) threatened employees and then subsequently changed the time and attendance policies without first giving the Union notice and an opportunity to bargain; 7) delayed providing relevant bargaining information requested by the Union for bargaining purposes; 8) delayed and cancelled bargaining sessions with the Union; and 9) engaged in bad faith bargaining

---

[20] *Frankl v. HTH Corp.*, 650 F.3d at 1355. S*ee also Small v. Avanti Health Systems, LLC,* 661 F.3d 1180, 1187 (9th Cir. 2011).

[21] *Starbucks Corp.*, 144 S. Ct. at 1575 (quoting *Winter v Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)).

[22] *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981) ("likelihood of success" does not equate to "success.")

[23] Petitioner is requesting §10(j) relief for the 2024 annual merit wage increase only under the theory that Respondent's conduct violated §8(a)(3) of the Act because it was inherently destructive of employees' Section 7 rights and was otherwise in retaliation for the employees' union activities. Petitioner is not requesting §10(j) injunctive relief under the theory that Respondent violated §8(a)(5) by withholding the 2024 annual merit wage increase from its unionized employees without first giving the Union notice and opportunity to bargain.

with the Union to frustrate bargaining and with no intention of reaching an initial collective bargaining agreement.

### 1. Respondent Unlawfully Eliminated Wage Increases.

#### a. Respondent's Elimination of the 2023 and 2024 Wage Increases Violated §8(a)(1) and (3)[24] of the Act.

Where an employer's conduct is inherently destructive of employees' Section 7 rights, the Board need not show it was "motivated by an antiunion purpose" because the conduct "carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.'"[25] The Board will find that an employer violates §8(a)(1) and (3) of the Act when it withholds an established term and condition of employment from its newly-organized employees, while continuing the same for unorganized employees," absent an overriding business justification, because such conduct is

---

[24] Section 8(a)(1) of the Act prohibits employers from interfering with, restraining or coercing employees in the exercise of their rights guaranteed in §7 of the Act (29 U.S.C. §157). §7 of the Act provides that employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in §8(a)(3).

Section 8(a)(3) of the Act makes it an unfair labor practice [for an employer] by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization (proviso not relevant omitted).

[25] *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33–34 (1967) (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 231 (1963)); *see, e.g., Loomis Courier Serv., Inc. v. NLRB,* 595 F.2d 491, 495 (9th Cir. 1979) (unlawful motive may be inferred where employer's conduct is "inherently destructive" of employees' rights); *Los Angeles Marine Hardware Co., Div. of Mission Marine Assocs. v. NLRB,* 602 F.2d 1302, 1307 (9th Cir. 1979) ("When the employer's conduct is 'inherently destructive,' however, antiunion motivation is presumed to exist."); *see also Clements v. Alan Ritchey, Inc.*, 165 F. Supp. 2d 1068, 1077 n.2 (N.D. Cal. 2001) (in §10(j) proceeding, noting that, "Proving specific anti-union purpose is unnecessary, however, where the employer's conduct is found to be 'inherently destructive' of employees' §7 rights.").

"inherently destructive" of employees' Section 7 rights.[26] Cases "finding an employer's conduct inherently destructive" involve "conduct with far reaching effects which would hinder future bargaining, or conduct which discriminates solely upon the basis of participation in . . . union activity."[27] If the conduct in question falls within this 'inherently destructive' category, the employer has the burden of explaining away, justifying or characterizing 'his actions as something different than they appear on their face,' and if he fails, 'an unfair labor practice charge is made out.'[28] And even if the employer does come forward with counter explanations for his conduct in this situation, the Board may nevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.[29] On the other hand, when 'the resulting harm to employee rights is comparatively slight,

---

[26] *See Arc Bridges, Inc. (Arc Bridges I)*, 355 NLRB 1222 (2010); *Covanta Energy Corp.*, 356 NLRB 706 (2011) (eliminating existing corporate bonus and annual recommended wage increase for unionized employees was "inherently destructive" of their §7 rights); *Eastern Maine Medical Center*, 253 NLRB 224, 242 (1980) (withholding of annual wage increase from unit employees because employer was in negotiations with union over wages was inherently destructive)*, enforced*, 658 F.2d 1 (1st Cir. 1981); *United Aircraft Corp.*, 199 NLRB 658, 662 (1972) (no proof necessary that employer's decision to withhold wage increase was unlawfully motivated because its conduct was "inherently destructive of important employee rights"), *enforced in relevant part*, 490 F.2d 1105, 1109-10 (2d Cir. 1973) ("[I]t is difficult to imagine discriminatory employer conduct more likely to discourage the exercise by employees of their rights to engage in concerted activities than the refusal to put a scheduled wage increase into effect because the employees, four days before, selected a union as bargaining representative.").

[27] *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976); *see also Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1386 (9th Cir. 1976) (where discriminatory conduct is directly related to protected activity, it is deemed inherently destructive); *Eads Transfer, Inc. v. NLRB*, 989 F.2d 373, 377 (9th Cir. 1993) (employer's "silent lockout" of strikers was inherently destructive of employees' right to strike).

[28] *Erie Resistor Corp. v. NLRB*, 373 U.S. 221, 228 (1963).

[29] *Id*. At 229.

Page 22          Memorandum of Points and Authorities in Support of Temporary Injunction

and a substantial and legitimate business end is served, the employers' conduct is prima facie lawful,' and an affirmative showing of improper motivation must be made.[30]

Here, Respondent eliminated annual merit wage increases—an established term and condition of employment for over two decades—based solely on whether employees exercised their right to unionize. Further, Respondent's March 21 email to employees and subsequent announcements by  supervisors consistently blamed the loss of this existing benefit on the employees exercising their Section 7 right to have Union representation and the pendency of bargaining. These messages along with Respondent's disparate treatment of represented and non-represented employees in relation to merit increases, informed all employees that exercising their Section 7 right to seek Union representation caused them to lose their annual merit increases. There can be no clearer message to the employees that seeking Union representation so as to affect their employment terms through the process of collective bargaining was an exercise in futility because Respondent will willingly ignore its obligations under the Act. Hence, Respondent's elimination of merit wage increases is 'inherently destructive' of employees' Section 7 rights. Once Petitioner meets its burden as it has, the burden shifts to Respondent to establish an overriding business justification for eliminating the wage increases.  Respondent failed to offer any business justification at all, not even a bad one.  Respondent's sole defense to the 2023 merit wage increase is that granting the increases to avoid a §8(a)(3) violation would run afoul of *NLRB v. Katz*, 369 U.S. 736 (1962), and subject Respondent to a §8(a)(5) charge with the Board.[31] But Respondent's argument is unavailing because granting the merit wage

---

[30] *Brown v. NLRB,* 380 U.S. 278, 289 (1965).

[31] Section 8(a)(5) of the Act provides that it shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees.

increase in such a situation would <u>not</u> constitute a violation under §8(a)(5) at all.  By granting the merit wage increase,  Respondent would be doing exactly what the Act requires, that is, maintaining the status quo, which was the granting of the annual merit wage increase as it had done for the prior twenty years.[32] Accordingly, the evidence establishes that Respondent's elimination of Union represented employees' 2023 and 2024 merit wage increases was inherently destructive of their Section 7 rights, in violation of §8(a)(3) of the Act.

In the alternative to the theory that Respondent's elimination of 2023 and 2024 wage increases for Union represented employees is inherently destructive of employees' Section 7 rights, Petitioner also has a high likelihood of success of proving that Respondent eliminated the well-established benefit of annual merit wage increases for newly-unionized employees because of its anti-Union animus.[33] To determine whether the employer acted based on an anti-union motive, the Board applies the *Wright Line*[34] framework. Thus, the General Counsel must make "a *prima facie* showing sufficient to support the inference that union activity was a 'motivating factor' in the employer's decision," by proving the following elements: (1) union activities by the alleged discriminatee(s); (2) employer knowledge of such activities; (3) employer adverse action against  the alleged discriminatee(s); and (4) employer anti-union animus.[35] Once the General Counsel establishes a *prima facie* case, the burden shifts to the employer to demonstrate

[32] (Tr. 218-219, 321, 351, 349, 356, 489-491, 517-519, 623, 656, 751, 756, 759-760, 772, 819-820, 907, 967; GC Ex. 49:6, 54; R Ex. 33-35; JT Ex. 1.)

[33] *See Wright Line*, 251 NLRB 1083, 1089 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982), *approved in NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401-02 (1983); *Intertape Polymer Corp.*, 372 NLRB No. 133, slip op. at 6-7 (2023) (Board reaffirming adherence to *Wright Line* analysis), *enforced*, 2024 WL 2764160 (6th Cir. May 9, 2024) (unpublished decision).

[34] 251 NLRB 1083 (1980).

[35] *Id*. at 1089.

that it would have taken the same action even in the absence of the employee's protected conduct.[36]

Here, Respondent knew about the employees' Union activities because they voted to be represented by the Union. Respondent must have known that eliminating Union represented employees' wage increases and telling them that it could not grant the wage increases because it had to bargain with the Union would result in employees blaming the Union and the bargaining process for the loss of the wage increases. Clearly, Respondent wanted employees and the Union to understand, and not to miss, that it was the selection of union representation that resulted in this significant loss of the existing pay scheme. Respondent's other violations, including its statements in both 2023 and 2024 blaming the loss of annual wage increases on the Union, the implementation of unlawful unilateral changes, the unlawful discharge of a prominent Union supporter, and its failure to bargain in good faith, amply demonstrate Respondent's anti-Union animus and a desire to undermine its employees' selection of the Union as their bargaining representative.[37]

For the reasons above, Petitioner has made a *prima facie* showing sufficient to support the inference that union activity was a 'motivating factor' in Respondent's decision to eliminate

---

[36] *Id*; *Flamingo Las Vegas Operating Co.*, 360 NLRB No. 41, slip op. at 2 (2014) (internal citations omitted). *Wright Line* does not require the General Counsel to show particularized animus towards the employee's own protected activity or to demonstrate some additional "link" or "nexus" between the protected activity and the adverse action.

[37] *See e.g., Covanta Energy*, 356 NLRB at 718 (finding employer's decision to withhold bonuses and wage increases was motivated by anti-union animus, in addition to being inherently destructive, because employer "actually advertised the antiunion rationale of its decision" by issuing a memo to employees blaming the loss of benefits on their "selection of union representation"); *Eastern Maine Medical Center*, 253 NLRB at 243 (finding employer's withholding of wage increases was inherently destructive but also motivated by anti-union animus as demonstrated by its coercive interrogation of job applicants, unlawfully broad no-solicitation and no-access rules, and failure to bargain in good faith).

the 2023 and 2024 wage increases for Union represented employees. The burden now shifts to Respondent to demonstrate that it would have taken the same action even in the absence of the employee's protected conduct, and Respondent failed to present any evidence or argument to meet that burden. Accordingly, the evidence establishes that Respondent eliminated the 2023 and 2024 wage increases for Union-represented employee based on an anti-Union motive.

>     b.    **Respondent Did Not Give the Union Notice and Opportunity to Bargain Before Eliminating Employees' 2023 Merit Wage Increases in Violation of §8(a)(5) of the Act.**

An employer violates §8(a)(5) of the Act if it unilaterally changes a term or condition of employment for bargaining unit employees without giving their bargaining representative advance notice and an opportunity to bargain about the change.[38] Where an employer has established a regularly-occurring wage increase program tied to fixed criteria, such as employee evaluations, it may not unilaterally discontinue that program.[39] Factors relevant to the determination of whether a wage increase is an established practice include "the number of years the program has been in place, the regularity with which raises are granted, and whether the employer used fixed criteria to determine whether an employee will receive a raise, and the

---

[38] *NLRB v. Katz*, 369 U.S. 736, 743 (1962).

[39] *See Daily News of Los Angeles v. NLRB*, 73 F.3d 406, 412-13 (D.C. Cir. 1996) (employer could not unilaterally discontinue its practice of granting annual wage increases tied to employee performance evaluations, even if the amount of the increase was discretionary); *NLRB v. Allied Prod. Corp.*, 548 F.2d 644, 652-53 (6th Cir. 1977) (employer acted unlawfully in discontinuing its merit wage review program because "a unilateral change in the existing wage structure" violates the Act "whether that change be an increase or the denial of a scheduled increase"). Because this case involves the withholding of an existing benefit, the Employer cannot rely on *Shell Oil Co.* and its holding that, absent an unlawful motive, an employer may introduce new benefits for its nonunionized workforce while withholding those improved employment terms from unionized employees. *See Shell Oil Co.*, 77 NLRB 1306, 1310 (1948) ("Absent an unlawful motive, an employer is privileged to give wage increases to his unorganized employees, at a time when his other employees are seeking to bargain collectively through a statutory representative.").

Page 26         Memorandum of Points and Authorities in Support of Temporary Injunction

amount thereof."[40] Even where the employer has exercised discretion in its economic criteria, the employer still had an obligation to maintain the fixed elements of its practice, such as the timing of the wage increases, and bargain with the Union over the discretionary aspects, including the amount of the increase.[41]

Here, the factors of timing and regularity are met here because for many years, Respondent's practice was to give employees merit increases every year in March or April. Respondent also trained its managers to follow specific guidelines listed in the Deck to determine the percentage increase an employee should receive, instructing them to use a ratio comparing the employee's payrate to the market median and then incorporate the employee's annual performance rating. Testimony from Manager Mercado confirmed that Respondent's practice was for managers to follow this preset formula and that managers did not consider other factors. There is also testimony that Respondent regularly granted some amount of a merit increase. Gilroy employee Badilla testified that he was told by management that each employee should receive at least a 1% raise when he previously worked as an Assistant Manager. And Gilroy Clinical Manager Mercado testified that during her three years with the Employer, she "always gave [the employees] something." In light of all the foregoing evidence, Respondent was obliged to bargain with the

---

[40] *Rural/Metro Medical Services*, 327 NLRB 49, 51 (1998).

[41] *Windsor Redding Care Center, LLC*, 366 NLRB No. 127 (2018) (finding employer obligated to maintain fixed elements of merit wage program, specifically the timing of the wage increases); *Mission Foods*, 350 NLRB 336 at 337 (2007) (finding employer obligated to maintain fixed elements of structural wage increase and negotiate with the union over discretionary element); *Daily News II*, supra at 1236 (finding employer obligated to maintain annual merit increase "[n]otwithstanding the element of discretion retained by the [r]espondent in setting the amount of merit raises"); *Central Maine Morning Sentinel*, 295 NLRB 376, 376 (1989) (finding employer obligated to maintain annual wage increase even though the amount was discretionary).

Union before discontinuing the status quo annual merit wage increases.[42] But Respondent simply eliminated merit increases for Union represented employees in 2023 and failed to give the Union prior notice and opportunity to bargain in violation of §8(a)(5) of the Act as discussed below.

Respondent claims that the Union's October 5 unfair labor practice charge regarding the elimination of the 2023 merit wage increases was untimely under §10(b) of the Act because the Union had notice of the unilateral change as of the March 20 letter or, alternatively, as of April 7, when the increases were implemented at facilities that the Union later organized. §10(b) states that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . .."[43] This period does not begin to run until the charging party has "clear and unequivocal notice" of the acts that constitute the alleged unfair labor practice.[44] Accordingly, §10(b) "does not bar any allegation that was not within the knowledge of or which could not have been discovered by the charging parties with reasonable

---

[42] Similar to the finding at Section 1(a) of this Memorandum, that Respondent's elimination of annual merit wage increases violated §8(a)(3) and that restoration of these increases is the proper remedy, the Board has, in some cases, also ordered such a remedy in the context of §8(a)(5) violations based on analogous conduct. *See Daily News of Los Angeles*, 315 NLRB 1236, 1241 (1994) (where employer violated §8(a)(5) by unilaterally withholding discretionary wage increases during first contract bargaining, Board ordered employer to pay employees "the difference between their actual wages and the wages they would have otherwise received"), *enforced*, 73 F.3d 406 (D.C. Cir. 1996); *Central Maine Morning Sentinel*, 295 NLRB 376, 376, 381 (1989) (ordering employer to pay unit members the difference between their actual wages and the wages they would have received absent the employer's unilateral withholding of discretionary wage increases in violation of §8(a)(5)).

[43] 29 U.S.C. §160(b).

[44] *John Morrell & Co.*, 304 NLRB 896, 899 (1991), *enforced sub nom. United Food & Com. Workers Int'l Union v. NLRB*, 998 F.2d 7 (D.C. Cir. 1993); *see also Rubin v. Grill Concepts Servs., Inc.*, 2023 WL 334017, at *1 (9th Cir. Jan. 20, 2023) (§10(j) proceeding).

Page 28        Memorandum of Points and Authorities in Support of Temporary Injunction

diligence."[45] Notice will not be found where there is a delay in filing due to conflicting signals or otherwise ambiguous conduct.[46] The party raising §10(b) as an affirmative defense bears the burden of proof.[47]

Here, Respondent's March 20 letter did not provide "clear and unequivocal notice" because it did not state that merit increases were being eliminated or withheld, only that no decision had been made. In fact, the letter seemed to imply that employees would receive a merit increase in 2023 but possibly at a different time than usual. Further, Respondent's assertion that the Union should have known that merit increases were eliminated by April 7—because non-unionized facilities that were later organized received their wage increases on that date—is wholly unreasonable. Respondent's March 20 letter had already implied that the timing of merit wage increases for represented unionized facilities would likely change in relation to unrepresented facilities. Accordingly, the Union did not have clear and unequivocal notice of Respondent's elimination of the 2023 merit wage increases outside of the 10(b) period.

### 2.   Respondent Repeatedly Threatened Workers

An employer violates §8(a)(1) of the Act[48] if its conduct would tend to coerce a reasonable employee in the exercise of his or her Section 7 rights. *Saginaw Control & Engineering, Inc.*, 339 NLRB 541 (2003).  Unlawful statements include those that threaten

---

[45] *Oregon Steel Mills*, 291 NLRB 185, 192 (1988), *enfd. mem. sub nom. Gilmore Steel Corp. v. NLRB,* 1989 WL 435373 (9th Cir. Oct. 17, 1989); *E. Bay Auto. Council v. NLRB*, 483 F.3d 628, 634 (9th Cir. 2007) (finding union did not have actual or constructive knowledge of unilateral promotions and wage increases).

[46] *A & L Underground*, 302 NLRB 467, 469 (1991).

[47] *See Chinese American Planning Council*, 307 NLRB 410, 410 (1992), *review denied mem.* 990 F.2d 624 (2d Cir. 1993).

[48]   Section 8(a)(1) of the Act prohibits employers from interfering with, restraining or coercing employees in the exercise of their rights guaranteed in §7 of the Act (29 U.S.C. §157).

Page 29          Memorandum of Points and Authorities in Support of Temporary Injunction

employees for engaging in protected activities,[49] implicitly threaten plant closure,[50] threaten stricter enforcement of time and attendance policies,[51] suggest that electing the Union was futile,[52] and imply that the Employer would refuse to hire employees engaged in Union activity.[53] The Board has also found a violation when employers announce to employees that there will be no wage increase during negotiations with a union, notwithstanding the employer's history of providing annual wage increases.[54] If an employee would reasonably interpret a

---

[49] *Gissel v. NLRB*, 395 U.S. 575, 617 (1969).

[50] *See, e.g., NLRB v. Lantz*, 607 F.2d 290, 298 (9th Cir. 1979) ("Under [§]8(a)(1), verbal communication from an employer may not contain threats of reprisal such as suggesting an operation will close down if employees become unionized.") (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617-19 (1969)); *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596, 599 n.1 (9th Cir. 1979) (threats of plant closure are coercive unless "phrased as economic predictions based on objective facts beyond the employer's control.").

[51] *See, e.g., L'Eggs Prod., Inc. v. NLRB*, 619 F.2d 1337, 1347 (9th Cir. 1980) (repeated employer statements that electing union representation "might" result in the employer requiring time clock punches, paying employees on an hourly basis, and employees not being able to take vans home were coercive threats); *Santa Fe Drilling Co. v. NLRB*, 416 F.2d 725, 728-29 (9th Cir. 1969) (finding 8(a)(1) violation where supervisor commented that "there would be no more coffee breaks, movies would be curtailed, and visits to the lavatory would be restricted" because employees voted for the union).

[52] *See, e.g., Hecla Min. Co. v. NLRB*, 564 F.2d 309, 314 (9th Cir. 1977) (supervisor violated §8(a)(1) by telling employee that electing a union "would not help workers because they already had everything they could hope for"); *Federated Logistics & Operations, Inc. v. NLRB*, 400 F.3d 920, 924–25 (D.C. Cir. 2005) (statements that bargaining would start from zero and benefits would be lost if employees unionized amounted to unlawful threats of futility).

[53] *See, e.g., Hertzka & Knowles v. NLRB*, 503 F.2d 625, 628 (9th Cir. 1974) (finding implied threat to blacklist union supporters where management representative expressed view that employees' employment was "transitory" and, when employees left the firm, it would be difficult for them to subsequently "secure employment"); *AutoNation, Inc. v. NLRB*, 801 F.3d 767, 773–74 (7th Cir. 2015) (finding unlawful statements that suggested other employers would be suspicious of employees who worked in union shops or workplaces that had "gone through" union campaigns and would refuse to hire them based on the "scarlet letter" of prior union membership).

[54] *See, e.g., First Student, Inc.*, 359 NLRB 208 (2012); *More Truck Lines, Inc.*, 336 NLRB 772 [2001], enfd. 324 F.3d 735 (D.C. Cir. 2003); *Jensen Enterprises*, 339 NLRB 877 (2003).

remark as a threat, then the remark violates §8(a)(1) regardless of the speaker's actual intent or the actual effect on the listener.[55]

Here, Respondent made unlawful threats through its repeated statements to employees blaming the Union for the elimination of annual merit wage increases in 2023 and 2024. Respondent committed additional unlawful threats through Hernandez threatening the closure of the Vallejo clinic, threatening stricter enforcement of time and attendance policies, suggesting that electing the Union was futile because Respondent could not meet its demands, and implying that Respondent and other dialysis companies would refuse to hire employees engaged in Union activity. Accordingly, these statements would tend to coerce a reasonable employee in the exercise of their Section 7 rights.

### 3. Respondent Unlawfully Terminated Mendoza.

As explained above, the legal framework for establishing unlawful animus discrimination under §8(a)(3) is set forth in *Wright Line* and its progeny. Mendoza was a known Union supporter who engaged in significant Union activity. The Employer was undeniably aware of this activity since Mendoza delivered the Organizing Committee letter to Clinical Manager Hernandez at the Vallejo facility and texted with Hernandez about unionization.

Evidence that an employer's hostility to protected activity motivated its decision to take adverse action against an employee may include: (1) statements of animus directed to the employee or about the employee's protected activities;[56] (2) statements by the employer that are specific as to the consequences of protected activities and are consistent with the actions taken

---

[55] *Concepts & Designs*, 318 NLRB at 954 (1995).

[56] See e.g., *Austal USA, LLC*, 356 NLRB 363 (2010) (unlawful motivation found where HR director interrogated and threatened union activist, and supervisors told activist that management was "after her" because of her union activities).

against the employee;[57] (3) close timing between discovery of the employee's protected activities and the discipline;[58] (4) the existence of other unfair labor practices that demonstrate that the employer's animus has led to unlawful actions;[59] or (5) evidence that the employer's asserted reason for the employee's discipline was pretextual, e.g., disparate treatment of the employee, shifting explanations provided for the adverse action, failure to investigate whether the employee engaged in the alleged misconduct, or providing a non-discriminatory explanation that defies logic or is clearly baseless.[60]

Here, Respondent displayed clear animus through the multiple threats Hernandez directed at Mendoza, the timing of Mendoza's discipline, which occurred immediately after she participated with the Organizing Committee to deliver a letter to Hernandez about the employees' interest in unionizing, and Respondent's past tolerance of Mendoza's tardiness.[61]

---

[57] See e.g., *Wells Fargo Armored Services Corp.*, 322 NLRB 616, 616 (1996) (unlawful motivation found where employer unlawfully threatened to discharge employees who were still out in support of a strike, and then disciplined an employee who remained out on strike following the threat).

[58] See, e.g., *Traction Wholesale Center Co., Inc. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000) (immediately after employer learned that union had obtained a majority of authorization cards from employees, it fired an employee who had signed a card).

[59] See, e.g., *Mid-Mountain Foods*, 332 NLRB 251, 251 n.2 (2000), enfd. mem. 11 Fed. Appx. 372 (4th Cir. 2001) (relying on prior Board decision regarding respondent and, with regard to some of the alleged discriminatees, relying on threatening conduct directed at the other alleged discriminatees).

[60] See, e.g., *Lucky Cab Company*, 360 NLRB 271 (2014); *ManorCare Health Services – Easton*, 356 NLRB 202 (2010); *Greco & Haines, Inc.,* 306 NLRB 634, 634 (1992); *Wright Line*, 251 NLRB at 1088, n.12, citing *Shattuck Denn Mining Co. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966); *Cincinnati Truck Center*, 315 NLRB 554, 556-557 (1994), enfd. sub nom. *NLRB v. Transmart, Inc.*, 117 F.3d 1421 (6th Cir. 1997).

[61] *See Kava Holdings, LLC v. NLRB*, 85 F.4th 479, 487 (9th Cir. 2023) (under *Wright Line,* General Counsel bears initial burden of showing "(1) union or other protected activity by the employee, (2) employer knowledge of that activity, and (3) animus against union or other protected activity on

Moreover, Hernandez told Mendoza that notifying the Union about her initial March 21 disciplines was the reason she was subsequently disciplined and terminated, the latter which occurred within weeks after the Union became the employees' certified representative at the Vallejo clinic. Respondent's claim that it disciplined and terminated Mendoza for her frequent tardiness is pretextual because it more than tolerated her tardiness for years before March 2023. Respondent had issued to Mendoza three final written warnings for tardiness (2019, 2020, and 2021), but it never suspended or terminated her even though it justifiably could have done so and instead, it gave her merit increases each year. Mendoza frequently clocked into work late after transferring back to the Vallejo clinic in 2022, but prior to March 2023, Respondent had not issued discipline her since October 2021. For these reasons, the evidence establishes that Respondent's decision to discipline and terminate Mendoza was motivated, in part, by animus towards her Union activities.

Once Counsel for the General Counsel establishes a prima facie case that Respondent disciplined and terminated Mendoza due to her Union activity, the burden shifts to Respondent to prove, as an affirmative defense, that it would have disciplined and discharged Mendoza even in the absence of her union activities. Respondent cannot meet this burden. The evidence shows that Respondent's reasons for disciplining and terminating Mendoza were pretextual, rebutting any attempts by Respondent to show that it would have taken the same adverse actions, absent her union activities.[62] Respondent also provided no comparable evidence showing that before

---

the part of the employer.") (quoting *Intertape Polymer Corp.,* 372 NLRB No. 133, slip op. at 7 (2023)).

[62] *Rood Trucking Company, Inc.,* 342 NLRB 895, 897 (2004)*; KNTV, Inc.*, 319 NLRB 447, 452 (1995) (finding that false and pretextual nature of employer's justification for terminating employee sufficient to rebut any defense that it would have taken the same action absent the employee's protected activity), citing *Transp. Mgmt. Corp.,* 462 U.S. 393 (1983).

Page 33          Memorandum of Points and Authorities in Support of Temporary Injunction

terminating Mendoza for tardiness, it had similarly disciplined and terminated other workers on the same basis.

### 4. Respondent Unlawfully Changed Its Time and Attendance Policies Without First Giving the Union Notice and Opportunity to Bargain in Violation of §8(a)(5) of the Act.

An employer is prohibited from making changes related to wages, hours, or terms and conditions of employment without first affording the employees' bargaining representative a reasonable and meaningful opportunity to discuss the proposed modifications.[63] In *Ferguson Enterprises, Inc.*, 349 NLRB 617, 618 (2007), the Board held that where a unilateral change is accompanied by the threat or imposition of discipline, the Board will find a violation without regard to whether the change is otherwise material, substantial, or significant.[64] The Board has regularly found that enforcing a previously unenforced policy can support a unilateral change finding.[65] Moreover, a new policy of stricter enforcement of extant work rules is subject to notice and bargaining.[66] It has long been acknowledged that lunch and break periods are terms and conditions of employment.[67]

Here, because they were enforced with the threat and imposition of discipline, Respondent's new requirement that employees sign in and out of their breaks and stricter enforcement of extant policy by prohibiting workers from clocking into work more than five-

---

[63] *Flambeau Airmold Corp.*, 334 NLRB 165, 165 (2001), citing *Katz,* supra.

[64] See. *King Soopers, Inc.*, 340 NLRB 628 (2003); *United States Postal Service*, 341 NLRB 684, 687 (2004); *Flambeau Airmold Corp.*, supra at 166.

[65] *Flambeau Airmold Corp.*, 334 NLRB at 166; *Advertiser's Mfg. Co.*, 280 NLRB 1185, 1190-1191 (1986).

[66] *St. John's Community Services-New Jersey*, 355 NLRB 414 (2010).

[67] *Garrison Valley Center, Inc.*, 246 NLRB 700, 709 (1979); *Pepsi-Cola Bottling Co.*, 315 NLRB 882, 895 (1994) (changing lunch periods violated §8(a)(5)).

minutes early and considering them late for clocking in even one minute late, both constituted material and substantial changes in the employees' working conditions. Prior to these changes, Respondent never had or enforced such rules, and Respondent presented no evidence to the contrary. Respondent unilaterally implemented these changes without giving the Union notice and opportunity to bargain, presenting them as a *fait accompli*, in violation of §8(a)(5) of the Act.[68] Respondent terminated Mendoza based on its stricter enforcement of the time and attendance policies, which was cited in her termination letter. Hence, Respondent's termination of Mendoza also violated §8(a)(5) of the Act because the Board has held that an employer commits such a violation if it disciplines or discharges an employee due to an unlawfully implemented work rule or policy that was a factor in the discipline or discharge.[69]

For these reasons, Respondent violated §8(a)(5) of the Act by unilaterally implementing a new stricter recording of breaks requirement and enforcement of its attendance policy and by discharging Mendoza based on this stricter enforcement.

### 5. Respondent Failed to Bargain in Good Faith with the Union in Further Violation of §8(a)(5) of the Act.

#### a. Respondent Failed to Lawfully Respond to the Union's Information Requests.

An employer has the statutory obligation to provide, on request, relevant information that the union needs for the proper performance of its duties as collective-bargaining representative.[70]

---

[68] *Pontiac Osteopathic Hospital*, 336 NLRB 1021 (2001).

[69] *See El Paso Elec. Co. v. NLRB,* 681 F.3d 651, 660 (5th Cir. 2012) ("Management violates §8(a)(5) when it discharges an employee in whole or part based on the employee's violation of an unlawful unilateral policy change."); *Flambeau Airmold Corp.*, 334 NLRB 165, 166-67 (2001) (employer's discharge of employee pursuant to an unlawfully implemented work rule violated §8(a)(5)).

[70] *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152 (1956); *NLRB v. Acme Industrial Co., 385 U.S. 432, 435-36 (1967); Detroit Edison Co. v. NLRB,* 440 U.S. 301 (1979)*; Disneyland Park,* 350 NLRB

Additionally, when faced with a request for relevant information, a party is required to make a reasonable good-faith effort to respond to the request as promptly as the circumstances allow.[71] In determining whether a party has failed to furnish information in a timely manner, the Board considers a variety of factors, including the nature of the information sought (including whether the requested information is time sensitive); the difficulty in obtaining it (including the complexity and extent of the requested information); the amount of time the party takes to provide it; the reasons for the delay in providing it; and whether the party contemporaneously communicates these reasons to the requesting party.[72] The Board has found delays as short as two and three weeks violative of the Act, under certain circumstances.[73]

Here, Respondent delayed providing the information the Union requested on January 4 concerning the Gilroy, Morgan Hill, San Francisco, and Blossom Valley clinics, May 3 concerning the Vallejo clinic, and July 11 concerning the Rohnert Park clinic. Respondent did not provide the information outstanding from the January 4 request until shortly before the parties September 18 bargaining session: employee identification numbers and wage

---

1256, 1257-58 (2007) (information concerning the terms and conditions of employment of employees in the bargaining unit, including wages, is presumptively relevant); *Fleming Co.*, 332 NLRB 1086, 1087 (2000).

[71] *See Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403, 408–09 (9th Cir. 1977) (employer's months-long delay in supplying union with information about current health and welfare plan and employee seniority supported a finding of bad faith bargaining); *NLRB v. Stanislaus Imp. & H. Co.*, 226 F.2d 377, 381 (9th Cir. 1955) (finding bad faith bargaining where, among other things, employer failed to furnish pertinent wage data). *Cf. K-Mart Corp. v. NLRB*, 626 F.2d 704, 706 n.2 (9th Cir. 1980) (finding an employer's "refusal to provide requested information" can constitute "evidence of surface bargaining").

[72] *West Penn Power Co.,* 339 NLRB 585 at 587 & fn. 6, 588 & fn. 9; See also *Postal Service*, 308 NLRB 547, 551 (1992); *Valley Inventory Service, Inc.*, 295 NLRB 1163, 1166 (1989).

[73] *Aeolian Corp.*, 247 NLRB 1231 (1980)(3 weeks); *Butcher Boy Refrigerator Door Co.*, 127 NLRB 1360 (1960) (20 days); and *Capitol Steel & Iron Co.*, 317 NLRB 809 (1995) (2 weeks).

scales/ranges. It was also at that time when Respondent finally produced any of the information requested by the Union on May 3 and July 11. The information was presumptively relevant because it plainly concerned employees' terms and conditions of employment and was necessary for the Union to prepare for bargaining and draft bargaining proposals. Respondent failed to provide any legitimate justification for the long delay in providing the information, which was all stored and subsequently given to the Union in electronic format. For these reasons, Respondent violated §8(a)(5) of the Act by delaying to provide information requested by the Union.

**b.      Respondent Continuously Delayed and Cancelled Bargaining Sessions.**

Section 8(d) of the Act [29 U.S.C. §158] states that the duty to bargain requires an employer to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder ... but such obligation does not compel either party to agree to a proposal or require the making of a concession ...."[74] The Board finds bad faith bargaining based in part on an employer cancelling many of the scheduled negotiation session.[75] In determining whether an employer has bargained in good faith, it is necessary to scrutinize the totality of its conduct. From the context of an employer's total conduct, it must be decided whether the employer is

---

[74] *West Coast Casket Co.*, 192 NLRB 624 (1971.), enfd. 469 F.2d 871 (9th Cir.1972).

[75] *See NLRB v. W. Coast Casket Co.*, 469 F.2d 871, 874–75 (9th Cir. 1972) (finding bad faith bargaining based in part on the fact that the employer's representative cancelled many of the scheduled negotiation sessions); *Professional Transportation, Inc.*, 362 NLRB 534, 534-35 (2017) (employer violated §8(a)(5) by cancelling seven consecutive bargaining sessions, establishing "an impermissible pattern of dilatory conduct").

lawfully engaging in hard bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement.[76]

Here, Respondent continuously delayed and cancelled the parties' initial bargaining sessions from the time of the Union's January 4 first demand to bargain to the parties first bargaining session on September 18. After sending the initial bargaining demand, the Union repeatedly pressed Respondent to agree to more bargaining dates. Despite the Union's efforts, it was not until May 5 that Respondent first agreed to the sole bargaining date of June 27. When Respondent later cancelled that bargaining date, it failed to explain whether US Renal would participate in negotiations or how the service management contract might otherwise impact bargaining, and US Renal subsequently never attended any of the parties bargaining sessions. After much prodding by the Union, Respondent agreed to meet for bargaining on July 24 and August 28 and 29. But Respondent cancelled those sessions due to Castellanos taking leave even though he frequently told the Union that he had to consult with his labor relations team and Center Manager Mildred Peralta testified that she contacted Castellanos and Market Director of Operations Donald Danks (Danks) for labor relations questions involving Union-represented workers. (Tr. 872-873.) These factors strongly indicate that Castellanos was not the only person who could bargain for Respondent, a large business operating over 60 clinics in California. Due to Respondent's continuous delay and cancellation of bargaining sessions, the parties did not first meet for bargaining until September 18 – over 9 months after the Union's initial demand for

---

[76] *See Frankl v. HTH Corp. (Frankl I)*, 650 F.3d 1334, 1358 (9th Cir. 2011) (noting that conduct away from the bargaining table may be considered in determining whether a party engaged in bad faith bargaining); *Seattle-First Nat. Bank v. NLRB*, 638 F.2d 1221, 1225 (9th Cir. 1981) ("Good faith must be determined from an examination of the totality of the circumstances."); *Overnite Transportation Co.*, 296 NLRB 669, 671 (1989) (party's conduct away from the bargaining table considered in weighing bad-faith bargaining allegation), *enforced*, 938 F.2d 815 (7th Cir. 1991).

bargaining. Accordingly, the totality of Respondent's conduct both at and away from the bargaining table—repeatedly delaying and cancelling its initial bargaining sessions with the Union, failing to promptly provide relevant requested information, unilaterally eliminating annual merit wage increases, and making coercive statements to employees—demonstrate an overarching failure to bargain in good faith.

**B.    Interim Relief is Equitably Necessary to Prevent Irreparable Harm to Employees' Rights under Section 7 of the Act and Protect the Board's Remedial Power.**

Likely irreparable injury is established in a §10(j) case by showing "a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."[77] Petitioner can make the requisite showing of likely irreparable harm either through evidence that such harm is occurring,[78] or from "inferences from the nature of the particular unfair labor practice at issue [which] remain available."[79]

Continuing §8(a)(5) violations involving the failure to bargain in good faith have and §8(a)(3) violations involving the unlawful discharge of union supporters "long been understood as likely causing an irreparable injury to union representation."[80] "[E]ven if the Board subsequently orders a bargaining remedy or reinstatement of the supporters, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties. That difficulty will increase as time goes on.

---

[77] *Frankl,* 650 F.3d at 1362. *See also Winter*, 555 U.S. at 22 (A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury, but instead it must be demonstrated that the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.)

[78] *See, e.g., Scott,* 241 F.3d at 667-68

[79] *Frankl,* 650 F.3d at 1362.

[80] *Id*. *See also Small*, 661 F.3d at 1191.

An order requiring that Respondent rescind its unlawful unilateral changes and implement the 2023 and 2024 annual merit wage increases[81] on a prospective basis is necessary to enable the Union to both regain lost support and bargain effectively on behalf of employees.[82] Absent such relief, the Union will be stuck bargaining at a deficit, forced to negotiate back benefits that employees should not have lost in the first place.[83] As time passes, employees will grow more likely to either abandon the Union in hopes of restoring their annual wage increases or, as many employees already have, seek employment elsewhere.[84] Indeed, testimony from several employees demonstrates that Respondent's elimination of merit wage increases, at some locations two years in a row, is rapidly diminishing Union support and driving employees to either look for jobs elsewhere or transfer to one of the Respondent's nonunionized facilities. Additionally, Respondent is using its unlawful withholding of annual merit wage increases as a

---

[81] *See Miller v. H & N Foods International, Inc. d/b/a H & N Fish Co.*, No. 4:03-CV-04002 (N.D. Ca. October 17, 2003) (unpublished decision) (ordering employer to grant unlawfully withheld regularly scheduled wage increases); *Small v. So. Cal. Permanente Med. Group*, 2010 WL 5509922, at *1-*2 (C.D. Cal. 2010) (prospectively granting unlawfully withheld annual across-the-board wage increase based on §8(a)(5) allegation); *Cf. Davis v. Servis Equipment Co.*, 341 F. Supp. 1298, 1302 (N.D. Tex. 1972) (ordering employer to comply with agreed-upon contract and implement wage raises contained therein on an interim basis).

[82] *See E. Bay Auto. Council*, 483 F.3d at 634 (unilateral changes to wages are "likely to have a long-lasting effect on employee support for a union because each paycheck reminds them of the likely irrelevance of the union.") (citing *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385 (1945) ("unilateral action minimizes the influence of organized bargaining [and] interferes with the right of self-organization by emphasizing to the employees that there is no necessity for a collective bargaining agent."); *Frankl v. HTH Corp.*, 825 F. Supp. 2d 1010, 1046-47 (D. Haw. 2011) (if left unchecked, employer's unlawful unilateral changes will cause irreparable harm to the union and employees that cannot be remedied by a final Board order), *affirmed*, 693 F.3d 1051 (9th Cir. 2012).

[83] *See Sw. Forest Indus. v. NLRB*, 841 F.2d 270, 275 (9th Cir. 1988) (restoration of status quo that existed before employer's unlawful unilateral changes is necessary "to ensure meaningful bargaining") (citing *Fibreboard Paper Prods. Corp. v NLRB.*, 379 U.S. 203, 217 (1964)).

[84] *See Overstreet v. Thomas Davis Med. Ctrs., P.C.*, 9 F. Supp. 2d 1162, 1166–67 (D. Ariz. 1997) (observing that numerous resignations by unit members after employer withheld benefits supported injunctive relief).

---

cautionary tale to prevent further unionization at its nonunionized facilities and as a weapon to punish those facilities that have already unionized. The evidentiary record amply demonstrates employees' growing frustration with the lack of wage increases and that the Respondent's messaging—blaming the Union and collective bargaining—is having its intended effect.[85]

Injunctive relief seeking the interim reinstatement of Mendoza and interim rescission of the unlawful discipline issued to her, interim rescission of the Respondent's unilateral changes, an interim order requiring that Respondent issue 2022 and 2023 performance evaluations and corresponding merit wage increases to unit employees, and an interim bargaining order would be equitably necessary to prevent irreparable harm to employees' statutory rights and preserve the Board's remedial authority. The "discharge of active and open union supporters," such as Mendoza, "risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process."[86] Such harm is evident here as Vallejo

---

[85] This case is distinguishable from *Lomax v. Longmont United Hospital & Centura Health*, 2023 WL 7924735 (D. Colo. Nov. 16, 2023), notice of appeal filed, No. 24-1014 (10th Cir. Jan. 10, 2024). In *Longmont*, while post-election representation proceedings were pending, an employer implemented a 3% across-the-board pay raise for its unrepresented employees while withholding these raises from employees who cast a ballot in the election. The employer also later rolled out improved benefits and additional pay raises for its unrepresented employees. The District Court declined to order the employer to extend these new wage increases and benefits to its unionized employees, observing that §10(j) proceedings were intended to restore the status quo that existed before an employer's unfair labor practices. In *Longmont*, the court believed that status quo consisted of the wages and benefits in place before the employer improved them for unrepresented employees. Ordering the employer to extend these new wage increases and benefits to represented employees would, the court opined, be too akin to awarding ultimate relief. That denial was on appeal before the Board recently issued its September 18, 2024 decision. Here, by contrast, the status quo, as established by Respondent, was the practice of annually evaluating its employees and issuing merit wage increases. Indeed, this is precisely what Respondent did at its Vallejo clinic in March and April 2023, which had not yet unionized. Requiring Respondent to issue merit wage increases prospectively on an interim basis would only require it to maintain the dynamic status quo, something it was already obligated to do under §§8(a)(5) of the Act. Accordingly, the unique situation in *Longmont*—involving a not-yet certified bargaining representative and new, one-time wage increases and benefits—is not present here.

[86] *Frankl I*, 650 F.3d at 1363 (quoting *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001)); *Portland Willamette Co.*, 534 F.2d at 1334 ("discharge for participation in union activities" creates "visible and continuing obstacles to the future exercise of employee rights").

Page 41        Memorandum of Points and Authorities in Support of Temporary Injunction

employees, after witnessing Respondent unlawfully discharge and then refuse to reinstate Mendoza without repercussion, became less engaged in Union activities and less communicative with Union representatives.[87] And, the Union's election victories at facilities after Mendoza was terminated do not diminish the need for interim relief. A post-violation Union election victory has no legal import; it signals only the sentiments of employees voting during a secret election, which allows employees to participate anonymously and without fear of retaliation. Thus, it is not the true measure of harm to collective bargaining, which requires demonstrations of open Union support, especially during the critical period surrounding a first contract. Further, although Mendoza currently states that she will accept an offer of interim reinstatement and resume her pro-Union activities at the Vallejo facility, the passage of time inevitably makes it less likely that she will be able to return under an eventual Board order.[88]

An order requiring that Respondent bargain with the Union in good faith would be equitably necessary in these circumstances.[89] Respondent's cancellation of initial bargaining sessions and delay in providing information has compounded the harm caused by its other unfair labor practices, making it less likely that an ultimate Board order can provide adequate relief. As

---

[87] *Cf. NLRB v. Ultra-Sonic De-Burring Inc, of Texas*, 593 F.2d 123, 125 (9th Cir. 1979) (in considering enforcement of *Gissel* bargaining order, court recognized that the discharges of prominent union supporters "eliminated the organizational activity of those already committed to the union while serving to warn others of the consequences should they come to the union's support").

[88] *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988) (noting that if a discriminatee must wait until a final Board order they will most likely find work elsewhere, and an order of reinstatement would then be "an empty formality"), *overruled on other grounds by Miller v. California Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994).

[89] Respondent is now meeting with the Union for bargaining sessions on a regular basis, which obviates the need for a bargaining schedule in this case. But simply meeting regularly with the Union does not remedy other aspects of Respondent's bad faith bargaining, such as its delay in providing relevant requested information, its implementation of unlawful unilateral changes to working conditions, and unilaterally withholding annual merit wage increases. Further, an interim bargaining order will ensure Respondent does not repeat its past unlawful conduct.

the Ninth Circuit has recognized, an employer's refusal to bargain in good faith is likely to irreparably erode employees' support for their chosen representative over time, chill concerted activity, and interfere with collective bargaining for a first contract.[90] By the time a final Board decision issues, it will be too late to effectively restore the lawful status quo as employees are deprived of the benefits of unionization and their support wanes.[91]

### C.    The Balance of Hardships Favors Interim Injunctive Relief.

"In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"[92] Courts must consider the matter in light of the underlying purpose of §10(j), which is "to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge."[93] Therefore, in balancing the equities, district courts must take into

---

[90] *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011) ("delay in bargaining weakens support for the union and a Board order cannot remedy this diminished level of support"); *Frankl I*, 650 F.3d at 1362 ("the result of an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether").

[91] *Frankl I*, 650 F.3d at 1362-63 ("'[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished'" and "even if the Board subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo") (quoting *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996)); *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 667-68 (9th Cir. 2001) (by the time the Board issues a bargaining order, a union "'may find that it represents only a small fraction'" of employees and "will be unable to bargain effectively regardless of the ultimate relief granted by the Board.") (quoting *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970)).

[92] *Winter*, 555 U.S. at 24 (*quoting Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

[93] *Miller v. California Pacific Medical Ctr.*, 19 F.3d 449, 461 (9th Cir. 1994), abrogated on other grounds by *Winter*.

---

Page 43        Memorandum of Points and Authorities in Support of Temporary Injunction

account the probability that declining to issue an injunction will permit "an alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority."[94]

Nor does the passage of time obviate the need for injunctive relief in this case. As courts have recognized, the Board must have time to "investigate and deliberate" before initiating §10(j) proceedings.[95] The Region issued its first complaint on October 13, 2023, six months after the Union's first charge on April 3, 2023, and the final complaint issued March 25, 2024. During that time, the Region was not only investigating extensive unfair labor practice charges at eight separate Respondent locations but was also processing representation cases as the Union's organizing drive continued. Then, on April 22, 2024, the Union filed its charge alleging that Respondent had once again withheld annual merit wage increases from its unionized employees, which included six new facilities. To ensure that any requested injunctive relief would provide a complete remedy, the Region had to expend time investigating this new charge, determining its merit, and issuing complaint covering these new allegations. Moreover, even with some passage of time, delay is "only significant if the harm has occurred and the parties cannot be returned to the status quo" such that a final Board order is likely to be as effective as interim relief.[96] Here, a core of Union support still exists and employees' support for the Union will be reinvigorated once Respondent's unfair labor practices are remedied on an interim basis; thus, showing

---

[94] *Starbucks Corp.*, 144 S. Ct. at 1585 (Jackson, J., concurring in part) (citing *Frankl,* 650 F.3d at 1362). See also *Small*, 661 F.3d at 1191; *Miller*, 19 F.3d at 459-60.

[95] *Aguayo*, 853 F.2d at 750. *See also Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 881 (3d Cir. 1990) (Board requires time to thoroughly investigate unlawful activity); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 539, 544-45 (4th Cir. 2009) ("[c]omplicated labor disputes like this one require time to investigate and litigate").

[96] *Aguayo*, 853 F.2d at 750; *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987) (rather than "requiring a consideration of the number of days or months" which pass between complaint and initiation of 10(j) proceedings, "the appropriate focus is on whether it is necessary to return the parties to status quo [to] protect the Board's remedial power" and whether "achieving the status quo is possible").

Page 44          Memorandum of Points and Authorities in Support of Temporary Injunction

employees the strength and effectiveness of Union representation and greatly improving the Union's chances of reaching a first collective bargaining agreement with Respondent. Accordingly, §10(j) interim relief is still appropriate even though some delay has occurred in this case.[97]

### D.     The Public Interest Will Be Advanced by Interim Injunctive Relief.

The public interest in a §10(j) case is to prevent remedial failure, ensuring that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge, while protecting employee rights."[98]

## V.     CONCLUSION

Based on the foregoing, it is respectfully submitted that Petitioner has demonstrated that it is likely to succeed in establishing that Respondent has committed violations of §§8(a)(1), (3), and (5) of the Act, and that the requested temporary injunctive relief is just and proper to prevent the destruction of employee free choice and the frustration of the policies and remedial purposes of the Act. Accordingly, Petitioner respectfully submits that this Court should grant the relief prayed for herein.

---

[97] *Frankl I*, 650 F.3d at 1363-65 (concluding that delay did not preclude finding irreparable harm in case where §10(j) petition was filed 16 months after complaint issued); *Spartan Mining Co.*, 570 F.3d 534, 544-45 (4th Cir. 2009) (finding 18-month passage of time between issuance of complaint and request for relief under 10(j) did not render injunction inappropriate); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) (affirming injunction despite 19-month passage of time between initial complaint and 10(j) petition); *Rubin v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1104-06 (C.D. Cal. 2015) (finding that delay of approximately 13 months after the alleged unfair labor practices occurred did not preclude a finding of irreparable harm).

[98] *Frankl*, 650 F.3d at 1365, *quoting Miller,* 19 F.3d at 460. *See also Small*, 661 F.3d at 1197.

DATED AT San Francisco, California, this 24th day of October, 2024.


                                        /s/ Jason Wong
                                    _____
                                    JASON P. WONG, Attorney for Petitioner
                                    NATIONAL LABOR RELATIONS
                                    BOARD, REGION 20
                                    450 GOLDEN GATE AVENUE,
                                    3RD FLOOR, SUITE 3112
                                    SAN FRANCISCO, CALIFORNIA  94102


KATHLEEN SCHNEIDER
        Regional Attorney, Region 20

JASON WONG
        Attorney, Region 20