KATHLEEN SCHNEIDER, CA BAR 174058
JENNIFER BENESIS, CA BAR 219559
JASON P. WONG, AZ BAR 024940, Counsel for Service
MCKENZIE A. LANGVARDT, CA BAR 352668
National Labor Relations Board, Region 20
450 Golden Gate Avenue, 3rd Floor, Suite 3112
San Francisco, California  94102
Telephone Number: (628) 221-8838
FAX: (415)356-5156
E-mail address:  Jason.wong@nlrb.gov

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JILL H. COFFMAN, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>Petitioner,<br><br>vs.<br><br>SATELLITE HEALTHCARE, INC.,<br><br>Respondent. | Civil No.  3:24-cv-07424<br><br>PETITIONER'S REPLY TO RESPONDENT'S SUPPLEMENTAL RESPONSE TO PETITION FOR INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT<br><br>Date: December 19, 2024<br>Time: 9:00 a.m.<br>Courtroom: 15<br>Judge: Honorable Rita F. Lin |

Pursuant to the Court's November 13, 2024, order granting Respondent Satellite Healthcare, Inc. ("Satellite" or "Respondent") an expedited discovery period in this matter and opportunity to submit supplemental briefing, Petitioner, Jill H. Coffman, Regional Director of Region 20 of the National Labor Relations Board (Board), for and on behalf of the Board, submits this response to Respondent's Supplemental Response to the Petition for Injunctive Relief.[1] Respondent's Opposition to the Petition (Opposition) and its Supplemental Response fail to rebut the abundant evidence establishing that its continuing unlawful actions, if left unchecked, will cause irreparable harm to employees' Section 7 rights[2] and the ability of SEIU United Healthcare Workers – West (Union) to represent the employees for collective bargaining purposes. Accordingly, Petitioner requests the Court to grant the Petition for Temporary Injunctive Relief (Petition).

### A.   THE STRONG EVIDENCE OF LIKELY IRREPARABLE HARM

[1] This response supplements Petitioner's Reply to Respondent's Opposition to the Petitoin for Injunction. (ECF #51.) References to exhibits attached to this reply will be referred to as "EXHIBIT A, B, C…." The Petition for Injunction and Memorandum in Support of the Petition will be referred to as the "Petition" and "Memorandum," respectively. References to the transcript of the hearing before the ALJ that are attached to the Memorandum as Exhibit H shall be referred to as "Tr." followed by the corresponding transcript page and line number(s). The parties' Joint Exhibits, General Counsel's Exhibits, Respondent's Exhibits, and the Charging Party Exhibits received into evidence by the ALJ are attached to the Memorandum as Exhibits I, J, K, and L, respectively. References to exhibits received into the record before the ALJ shall be made as follows - JT Ex., GC Ex., R Ex., and CP Ex. – followed by the corresponding internally paginated number if necessary.

[2] Section 7 of the National Labor Relations Act (Act) provides that employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in §8(a)(3).

Page 1   Reply to Respondent's Supplemental Response to the Petition

Likely irreparable injury is established in a §10(j) case by showing "a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."[3] Petitioner can make the requisite showing of likely irreparable harm either through evidence that such harm is occurring (see e.g., *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 667-68 (9th Cir. 2001)), or from "inferences from the nature of the particular unfair labor practice at issue [which] remain available." *Frankl I,* 650 F.3d at 1362. The "same evidence and legal conclusions" establishing likelihood of success, together with "permissible inferences regarding the likely interim and long-run impact of the likely unfair labor practices," provide support for a finding of irreparable harm.[4]

Contrary to Respondent, the concrete and continuing harms presented have chilled and diminished support for the Union, which undermines the Union's ability to effectively bargain for a first contract and sends the message that the Respondent may continue to commit violations with impunity. *See South Shore Hosp. v. NLRB,* 630 F.2d 40, 45 (1st Cir. 1980) (Board properly held that discriminatory refusal to grant wage increase to represented employees "'had a natural and foreseeable effect of chilling employee desires for Union representation'"); *Plasticrafts, Inc. v. NLRB*, 586 F.2d 185, 188 (10th Cir. 1978) (denial of a wage increase in response to protected union activity "inevitably conveys the

---

[3] *Frankl v. HTH Corp. (Frankl I),* 650 F.3d 1355, 1362 (9th Cir. 2011); *See also Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008) (A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury, but instead it must be demonstrated that the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.)

[4] *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1195-96 (9th Cir. 2011) (quoting *Frankl I,* 650 F.3d at 1363) (internal quotation marks omitted).

Page 2    Reply to Respondent's Supplemental Response to the Petition

message that [the employer], not the union, controls the purse strings. Employees will predictably consider that the union is somehow responsible for their failure to receive expected raises. … The giving of such messages is conduct which tends to interfere with employee free choice…".) Here, employees, who always received annual wage increases before joining the Union now face the prospect of indefinite financial stagnation if they continue to support the Union, which has already caused some employees to abandon the Union in hopes of restoring their wage increases. That is precisely why interim relief is necessary here. An affirmative signal that the Respondent may not act unlawfully with impunity would restore the legitimate level of employee Union support, repair the integrity of the collective bargaining process, and advance meaningful bargaining.

**B.      STATEMENTS OF EMPLOYEE CHILL AND REDUCTIONS IN UNIT SIZES ESTABLISH HARM**

**1.      The Union's Election Victories Are Factually Unrelated to the Regional Director's Showing of Harm**

Respondent argues that the Union's election victories at seven facilities from April 2023 to March 2024 show that Union support swelled, rather than diminished. First, the timeline of this case contravenes this argument. In April 2023, the seven non-Union facilities—that would, over the course of the next eleven months, go on to vote in favor of Union representation—had already received their own annual wage increases for that year.[5]   More importantly, post-violation election victories are not a true measure of harm.

[5] Conversely, by October 31, 2024, employees at the White Road clinic were well aware of the escalating scope of the Respondent's antiunion practices, as Respondent had withheld wage increases at the first four facilities two years in a row and at the next seven facilities for the first

Page 3     Reply to Respondent's Supplemental Response to the Petition

Employee votes for the Union afford individual employees a degree of protection because they are anonymous. Effective collective bargaining, however, requires demonstrations of open Union support, especially during the critical period surrounding a first contract. *See Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 501 (7th Cir. 2008) (risk of irreparable harm to union's status "particularly true" in cases involving "fledgling," recently-certified unions); *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992) ("The [u]nion was only recently certified by the Board and the employees were bargaining for their first contract. These two facts make bargaining units highly susceptible to management misconduct."). For these reasons, there is no merit to Respondent's argument that there has been no loss of employee support.

### 2. The Showing of Widespread Employee Chill is Not Undermined by Union Participation of a Handful of Employees

Respondent's argument that there is no actual harm because union support has remained consistent overfocuses on the fact that some original Union supporters continue to participate as part of the bargaining committee, at least one of whom does so without threat of retaliation because she no longer works for Respondent.[6] But the fact that some stalwart Union supporters continue to show "some degree of solidarity in adversity" does not negate the harmful impact of Respondent's misconduct over time, most importantly, on other employees. *See Pascarell*, 904 F.2d 874, 880 (3d Cir. 1990). It is the chilling

_____

time in years, and voted against Union representation in Board Case 32-RC-351454. (Exhibit D – the Board's Tally of Ballots for That Election.)

[6] Respondent highlights Katherine Nies (no longer works for Respondent), Raymond Berdos, Noelani Escovilla (no longer works for Respondent), Albert Li, Michale Badilla, Eugene Dela Pena, and Easen Pe Benito.

Page 4    Reply to Respondent's Supplemental Response to the Petition

impact on non-activist employees who comprise the core of the bargaining unit that is most critical to determining whether injunctive relief is equitably necessary. *See id.* at 880-81 (chilling effect of violations significant, even if some employees continued to show "some degree of solidarity;" the "critical" issue is the impact on "non-activist employees, who are the most susceptible to being intimidated"); *Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 847-49 (S.D. Ind. 1997) (interim relief during contract bargaining warranted, rejecting employer argument that there was no chill because employees were actively striking).

Respondent claims there is no evidence of diminishing support for the Union or that employees left Respondent due to not receiving their annual wage increases. But as exhibited above, that claim is false. The Union stalwarts referred to by Respondent often spoke with employees regarding the Union and their lack of receiving wage increases since joining the Union. (EXHIBIT A - Pe Benito Dep., 26:25 – 28:9; EXHIBIT B - Nies Dep., 27:11–23; 28:13-17.) During those discussions, employees expressed fear for further supporting the Union and growing frustration over the lack of wage increases, which destroyed employee morale.[7] (EXHIBIT A - Pe Benito Dep., 27:1 – 28:9; Memorandum Exh. W, 3:8-12.) Also, Mr. De La Pena may not have known all the reasons employees had for leaving Respondent, but he knew that many of them were frustrated with Respondent taking away their wage increases. (Memorandum Exh. Q, 1:8-10.) Moreover, Mr. Raymond Berdos, who works at the San Leandro

---

[7] Mr. Pe Benito was further demoralized when he emailed Manager Paula Luong asking if employees were going to receive a wage increase, to which Ms. Luong confirmed in writing that no wage was forthcoming until Respondent and the Union finished negotiations. (EXHIBIT A - Pe Benito Dep., 31:16 – 32:14, Dep. Exhibit 42, page 54.)

Page 5     Reply to Respondent's Supplemental Response to the Petition

clinic, observed a decline in open support for the Union at that clinic. To his surprise, many employees voted against Union representation in late September 2023, but that lack of support for the Union naturally resulted from employees' knowledge of wage increases being withheld from only Union represented employees since April and Ms. Mendoza's June termination.

Union Organizing Coordinator Jonathan Kim  is the best source of evidence regarding whether employee support has diminished and whether unit sizes have decreased. He was the main organizer during the Union's organizing campaign at the first facilities to organize: Gilroy, Morgan Hill, San Francisco, and Blossom Valley (collectively referred to as the First Four Clinics), which  joined the Union in December 2022, and thereafter, continued to work with the employees at those clinics. (Tr. 621:15 – 623:8.) Mr. Kim's Union role of organizing dialysis workers in northern California gave him a bird's eye view of organizing at other clinics, as well, where a dwindling number of Union-represented employees from the Morgan Hill and San Francisco clinics participated in the September 25 – 26 strike (Memorandum Exh. M, 1:2-9, 2:9-13.; Tr. 620:21-23.).

The reductions in unit size at several locations due to employees seeking employment elsewhere, including at nonunionized clinics; testimony that employees are retreating from previous open union support and expressing frustration that legal challenges have delayed a first contract, and the Union's diminished ability to expand its organization effort to other facilities demonstrate the continuing concrete harm of the Respondent's unfair labor practices. Indeed, Ms. Nies herself has consistently testified, including in her deposition, that she sought employment elsewhere because Respondent stopped giving the expected annual wage increase, which she reasonably anticipated not being able to rely on. (EXHIBIT B - Nies Dep., 33:7-24.)

Page 6     Reply to Respondent's Supplemental Response to the Petition

### C.    Managers Did Not State True Statements of Fact For Withholding Wage Increases

Contrary to Respondent, managers did not make true statements of fact regarding why employees were not receiving their wage increase. Rather, managers repeatedly told employees the legally incorrect and factually untrue message that Respondent could not legally grant them wage increases because it had to maintain the status quo and the parties had to bargain to an agreement now that they were represented by the Union. But as employees have repeatedly testified, receiving an annual wage increase was the status quo for years, until unionization began. (EXHIBIT B - Nies Dep., 29:1-15.)

### D.    Lead Employee Organizer Cathy Mendoza Must be Reinstated to Prevent Irreparable Harm.

The termination of employee Union leader Cathy Mendoza strikes at the heart of employees' Section 7 rights. Respondent contends that because Mendoza was able to participate on the bargaining committee after she was terminated, there is no "broken link" between the Vallejo clinic employees and the Union. To the contrary, Mendoza's termination created a wide gulf between the Union and the Vallejo clinic employees, as Mendoza no longer works side by side with the employees day in and day out—indeed severing a valuable communication link. Moreover, Respondent's argument fails to acknowledge the inherently chilling effect of terminating the Union's lead activist. Indeed, "a likelihood of success as to a Section 8(a)(3) violation [of the Act] with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances."[8] Though Mendoza

---

[8] *Frankl I,* 650 F.3d at 1363.

Page 7    Reply to Respondent's Supplemental Response to the Petition

began working for the Union and participated in bargaining after she was fired, her termination conveys the dire message to employees that supporting the Union may likely cost them their jobs.

Mendoza's termination was based on changes Respondent unilaterally made to the Vallejo clinic's time and attendance policies without first giving the Union notice and opportunity to bargain. Regardless of the passage of time, this unilateral change demonstrates to employees that Respondent is willing to alter policies to target and retaliate against Union supporters. The message to employees is clear: Respondent will manipulate policies to justify terminating them for their Union activities. This coercive tactic further chills employee's support for the Union and erodes their confidence in the collective bargaining process.

### E.    CONCLUSION

For the reasons stated above and in Petitioner's Reply to Respondent's Opposition to the Petition (ECF #51), Respondent fails to show that Petitioner has not met the four-factor test to establish that injunctive relief is needed and proper here. Thus, Petitioner respectfully asks that the Court grant the Petition for Injunction and order the requested injunction.

DATED this 12th day of December, 2024, at San Francisco, California.

/s/ Jason Wong
JASON WONG
Attorney for Petitioner
National Labor Relations Board
Region 20
450 Golden Gate Ave.
Floor 3, Suite 3112
San Francisco, California 94102

Page 8    Reply to Respondent's Supplemental Response to the Petition