UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JILL H. COFFMAN,<br><br>        Plaintiff,<br><br>    v.<br><br>SATELLITE HEALTHCARE, INC.,<br><br>        Defendant. | Case No.  24-cv-07424-RFL<br><br>**ORDER GRANTING INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT**<br><br>Re: Dkt. No. 1 |

Petitioner Jill H. Coffman, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board ("Petitioner"), filed a Petition for Temporary Injunction under Section 10(j) of the National Labor Relations Act on October 24, 2024, against Respondent Satellite Healthcare, Inc. ("Satellite").  (Dkt. No. 1.) Petitioner contends that it is likely to prevail on the merits of the underlying administrative proceedings in Board Cases 20-CA315531, 20CA-316334, 20-CA-321160, 20-CA-322476, 32-CA-322804, 20-CA-327603, 32-CA327746, 32-CA-327820, 32-CA-327847, and 20-CA-340738, alleging that Satellite has engaged in and continues to engage in conduct violating Sections 8(a)(1), (3), and (5) of the Act.

As detailed below, the Court concludes that Petitioner has shown a strong likelihood of success on its claims that Satellite: (1) discontinued historic annual wage increases for unionized employees in 2023 and 2024, while continuing to grant those increases to non-unionized employees and telling unionized employees that they could not have the customary increases because they had unionized; (2) unlawfully discharged employee Cathy Mendoza in retaliation for her union activities and began enforcing new employee tardiness and sign-in policies unilaterally in response to union organizing; (3) threatened to blacklist unionized employees and

implied that bargaining would force the clinics to close; and (4) repeatedly cancelled bargaining sessions without good reason and failed to timely provide basic data about employees' wages that was easily obtained and highly pertinent to the Union's bargaining strategy. Petitioner has further shown that these violations are likely to irreparably harm Satellite's employees in the previously certified bargaining units across eleven of Satellite's clinics in California, SEIU United Healthcare Workers West ("the Union"), and thwart the purposes and policies of the Act.

Having carefully considered the briefs, arguments of counsel, and the evidence in support of and in opposition to the Petition, the Court enters the following findings of fact and conclusions of law, and **GRANTS** the Petition with some limited modifications, for the reasons further explained below. Satellite's conduct appears to be in repeated and flagrant violation of the Act, and its actions have been shown to have undermined—and to be likely to continue to undermine—Union support across the clinics.

## I.    LEGAL STANDARD

"To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,' district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010). Thus, Petitioner "must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024).

The Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings. *See Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("[T]he district court did not abuse its discretion in considering hearsay and biased evidence . . . because the rules of evidence do not strictly apply to preliminary injunction proceedings.") (internal citation omitted). This flexibility exists because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to

procure supporting evidence in a form that would be admissible at trial. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). "While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) (internal quotations omitted).

## II.    LIKELIHOOD OF SUCCESS ON THE MERITS

Petitioner has demonstrated a likelihood of success on the merits of the underlying Board Cases. To show a likelihood of success on the merits, Petitioner must show a "probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that this Court would grant a petition enforcing that order, if such enforcement were sought." *Frankl v. HTH Corp.*, 693 F.3d 1051, 1062 (9th Cir. 2012) (citation omitted).

### A.    Discontinuation of annual merit pay increases

#### 1.    Section 8(a)(5)

Petitioner's claim that Satellite unlawfully and unilaterally discontinued annual merit pay increases for employees of unionized clinics in 2023[1] is likely to succeed. Under Section 8(a)(5) of the Act, an employer commits an unfair labor practice by "refus[ing] to bargain collectively with the representatives of [their] employees." 29 U.S.C. § 158(a)(5). "[W]hen[] . . . parties are engaged in negotiations [for a collective-bargaining agreement], an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole." *Bottom Line Enterprises*, 302 NLRB 373, 374 (1991) (emphasis added), *enforced sub nom. Master Window Cleaning, Inc. v. NLRB*, 15 F.3d 1087 (9th Cir. 1994). Whether the employer has satisfied its

---

[1] Petitioner does not allege a Section (8)(a)(5) violation for the withholding of the 2024 wage increase.

3

bargaining obligation regarding a wage increase practice is dependent on an analysis of the following questions: (1) Does the employer's practice constitute a term and condition of employment? (2) If so, was the status quo of that practice maintained during the course of contract negotiations? (3) If not, was the change unilateral, *i.e.*, implemented without the union's consent or in the absence of a clear and unmistakable waiver by the union of its right to bargain about the change? *Daily News of Los Angeles, Div. of Cooke Media Grp., Inc.*, 315 NLRB 1236 (1994); *see also In Re Burrows Paper Corp.*, 332 NLRB 82, 83 (2000).

### a.    Term and condition of employment

Petitioner has presented sufficient evidence to establish that the merit wage increases likely constitute a term and condition of employment at Satellite. In determining whether a wage increase practice is a term and condition of employment, the Board looks to the following three criteria: (1) the number of years the program has been in place; (2) the regularity with which raises are granted; and (3) whether the employer used fixed criteria to determine whether an employee will receive a raise and the amount thereof. *Lasalle Ambulance, Inc.*, 327 NLRB 49, 51 (1998).

There is no meaningful dispute as to factors (1) and (2). Indeed, at oral argument, Satellite's counsel admitted that the parties have previously stipulated to the fact that the wage increase is a longstanding annual practice. Numerous employees testified that they saw the annual wage increases as "status quo" and came to rely on the increase in their financial decision-making. (Pet. Supp. Ex. B at 29; Tr. 322, 493, 523.)[2]

Turning to factor (3), Petitioner provides persuasive evidence that Satellite used fixed criteria to determine whether and when an employee will receive a raise. In fact, it appears that

---

[2] The transcript of the hearing before the ALJ in the Board proceedings shall be referred to as "Tr." followed by the corresponding transcript page. The affidavits submitted with the Petition shall be referred to by "Pet. Ex." and their corresponding exhibit letter as assigned in Docket Number 2. The affidavits submitted with the Petitioner's Reply to Respondent's Supplemental Response shall be referred to as "Pet. Supp. Ex." and their corresponding exhibit letter as assigned in Docket Number 60. References to the General Counsel's Exhibits and Respondent's Exhibits shall be referred to as "GC Ex." and "R Ex." respectively, followed by the corresponding internally paginated number if necessary.

each eligible[3] employee was given at least a 1% pay increase in April of every year. The testimony of Mike Badilla, a union leader in the Gilroy clinic who had previously served as a supervisor, is particularly compelling on this point. While acting as a supervisor, Badilla described an instance in which he had initially planned to withhold the increase from an employee who would soon be fired, but was told he had to give everyone something, so he gave that employee a 1% pay increase. (Tr. 354; *see also* Tr. 221 (Mendoza testifying that she received a 2-4% wage increase despite receiving a final warning that same year).) That testimony is corroborated by Raymond Berdos of the San Leandro clinic, who stated that he believes he received a wage increase every year over the past ten years at Satellite. (Pet. Ex. U at 002671.) By contrast, Satellite identifies no evidence that merit pay increases were regularly withheld from groups of employees based on performance or any other criteria. Nor has Satellite identified any evidence that managers had the discretion to change the timing of when to issue these increases.

While Satellite asserts that each Center Manager had discretion over the amount of each employee's merit pay increase, that discretion also appeared to be guided by a set of fixed criteria. There is evidence that managers are first given a merit increase allocation (usually around a 3% increase) by Satellite leadership that they must then distribute across their employees. (Tr. 353–54.) This means that if a manager of two decides to give one employee a 2% increase, they are required to give the other a 4% increase. (*Id.*) Managers also attended yearly trainings that provided guidance on the criteria they could consider when allocating their merit budget for that year, which includes factors such as an employee's job classification pay range, years of experience, and external competitiveness for the role. (Tr. 681–86; *see also* GC Ex. 54 (example training deck)). At the administrative hearing, several managers testified that

---

[3] Eligibility also seemed to be determined using fixed criteria. For example, according to the training managers received, employees who were hired before the end of the year, per diem employees, employees on a performance improvement plan, interns, contractors, and employees with certain job classifications were not eligible for the annual merit increase. (GC Ex. 54 at 001950, R Ex. 33 at 002170; R Ex. 34 at 002218.)

they were expected to follow these guidelines when determining the amount of each employee's merit award.  (Tr. 825, 920.)  In fact, if a manager tried to ignore the criteria and give everyone the same raise, Satellite management would reject it if no further justification was provided.  (Tr. 688–89.)

### b.    Unilateral change to status quo

By eliminating merit wage increases for unionized employees, Satellite departed from the status quo practice established above.  Satellite conceded at the hearing that it stopped giving the wage increases as to unionized workers, while continuing them as to non-unionized workers.  That fact is amply established in the record as well.  (Tr. at 321, 350 (union employees at the Morgan Hill and Gilroy clinics testifying that they did not receive annual merit raises); Pet. Ex. X (attesting the employees did not receive the wage increases in each of the remaining represented clinics).)

Moreover, there is no evidence that Satellite provided the Union with notice or the opportunity to bargain over the issue of the merit wage increase.[4]  Satellite argues that notice was provided when it sent a letter to the Union in March 2023 stating that "no decisions" had been made regarding wage increases because "[t]here is no fixed criteria or practice for determining wage increases," which "may impact when and how a represented employee is informed about a wage increase they are going to receive."  (GC Ex. 4 at 001648.)  But this statement does not adequately inform the Union that it intended to *withhold* the merit wage increases entirely.  Further, there is troubling evidence that Satellite later refused to negotiate the terms of the wage increase without finalizing the rest of economic contract, stalling resolution of the issue and allowing the established practice to instead become a bargaining chip in the negotiations (R Ex. 61).  *See Covanta Energy Corp.*, 356 NLRB 706, 723 (2011) (finding elimination of annual wage increase and bonus for union employees to violate 8(a)(5) where the union was forced to bargain for the restoration of these practices).

---

[4] Bargaining had not even started when Respondent withheld merit pay raises in April 2023, as the first meeting occurred in September 2023.

Satellite claims that it could not issue the merit wage increases because the Supreme Court's ruling in *NLRB v. Katz*, 369 U.S. 736 (1962), tied its hands. In *Katz*, the Court held that the respondent violated Section 8(a)(5) when it unilaterally granted merit increases to twenty employees out of approximately fifty in the unit because "the raises here in question were in no sense automatic, but were informed by a large measure of discretion." 369 U.S. at 745–46. But unlike in *Katz*, Petitioner has produced persuasive evidence that the annual raises were "automatic" in the sense that they were issued at around the same time each year for over a decade. And numerous other courts have held that when the criteria for determining discretionary wage increases are fixed (even if the amount as to each individual increase is discretionary), *Katz* requires a company to continue to apply the same criteria for awarding increases during the bargaining period. *See Daily News of Los Angeles v. N.L.R.B.*, 73 F.3d 406, 412 (D.C. Cir. 1996); *General Motors Acceptance Corp.*, 196 NLRB 137, 137 (1972) ("[A]n element of discretion . . . was retained by the [Company] with respect to particular employees, but certainly not to the entire [wage increase] program."), *enforced* 476 F.2d 850 (1st Cir. 1973).

Moreover, that Satellite continued to withhold the wage increase even after the Union stated its willingness to waive its right to bargain over the wage increases—eliminating any chance of running afoul of *Katz*—further undermines its argument. (Pet. Ex. X at 002691.) Thus, Satellite cannot rely on *Katz* to justify its withholding of the annual merit wage increase.

## 2.    Sections 8(a)(1) and 8(a)(3)

Petitioner has sufficiently demonstrated that the withholding of the merit wage increase in 2023 and 2024 also likely violated Sections 8(a)(1) and 8(a)(3). Section 8(a)(1) makes it an unfair labor practice to "to interfere with, restrain, or coerce employees in the exercise" of their rights to organize and to bargain collectively. 29 U.S.C. § 158(a)(1). Relatedly, Section 8(a)(3) of the Act makes it an unfair labor practice to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3). Some employer conduct is so "inherently discriminatory or destructive" of employee rights that anti-union motivation is inferred, barring a

substantial business justification. *Fresh Fruit & Vegetable Workers Loc. 1096, United Fruit Com. Workers Int'l Union v. N.L.R.B.*, 539 F.3d 1089, 1096 (9th Cir. 2008) (citation omitted). The Board has consistently found that withholding wage increases from unionized employees, but not other employees, constitutes inherently destructive conduct. *See, e.g.*, *Eastern Maine Medical Center*, 253 NLRB 224, 242 (1980) (withholding of annual wage increase from unit employees because employer was in negotiations with union over wages was inherently destructive); *Covanta Energy*, 356 NLRB at 718 (finding employer's decision to withhold wage increases from unionized employees inherently destructive because employer "actually advertised the antiunion rationale of its decision" by issuing a memo to employees blaming the loss of benefits on their "selection of union representation").

As discussed above, Petitioner has sufficiently shown that the annual wage increase is a term and condition of employment, and that Satellite withheld these wage increases only for unionized employees. Moreover, as in *Covanta Energy*, Petitioner also presents evidence that Satellite explicitly communicated to employees that the elimination of the wage increase was due to their union activity and the pendency of bargaining. (Pet. Ex. U at 002672; Pet. Ex. N at 002645). And because Satellite provides no business justification for this practice—apart from its *Katz* theory rejected above—it is likely unlawful under both Section 8(a)(1) and (3).

### B.    Discharge of Mendoza

Petitioner has also demonstrated a likelihood of success on the merits as to the charge of unlawful termination of Cathy Mendoza in violation of Sections 8(a)(1) and (3). To establish whether an adverse employment action was discriminatorily motivated, Petitioner must first make a prima facie showing supporting the inference that the employee's union and/or protected activities were a motivating factor in the employer's adverse action. *Wright Line*, 251 NLRB 1083, 1089 (1980). A prima facie case includes the following elements: (1) the employee engaged in protected concerted activities; (2) the employer had knowledge of these activities; (3) there was an adverse employment action; and (4) employer animus towards the employee's protected activities. *Kava Holdings, LLC v. NLRB*, 85 F.4th 479, 487 (9th Cir. 2023).

From Petitioner's evidence, it is reasonable to infer that leaders of the Vallejo clinic were aware of Mendoza's Union activities when she was terminated in June 2023. On March 10, 2023, Mendoza and two other employees delivered an organizing letter to Clinic Manager Myrna Hernandez—who later participated in the conversation terminating Mendoza—and met with her behind closed doors. (Tr. 534.) Pictures of Mendoza's face appeared on the organizing committee flyer. (GC Ex. 26.) Indeed, Mendoza is recognized to be one of the "strongest" and most active Union supporters among the resident nurses at the clinic.[5] (Tr. 609.)

Petitioner has also adequately established animus from the timing of Mendoza's discharge and the nature of Hernandez's comments to Mendoza about participation in the Union. *See, e.g.*, *Traction Wholesale Center Co., Inc. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000) (holding that close timing between discovery of the employee's protected activities and the discipline is evidence of hostility). Mendoza testified that on several occasions, Hernandez told her that unionization could lead to financial ruin and tried to convince her that a paid anti-Union consultant hired by Satellite was an "independent" third party. (Tr. 164–66; GC Ex. 17.) Mendoza further testified that when she and two other employees expressed interest in unionizing, Hernandez cautioned them that other clinics might not hire employees who were publicly organizing because they had revealed themselves as known Union supporters. (Tr. 145–147.) Later that day, Hernandez texted Mendoza messages implying that she had been willing to overlook Mendoza's tardiness and that Mendoza should be grateful. (GC Ex. 17 at 001739, 001742–001743.) Just two weeks after Mendoza's meeting with Hernandez, Mendoza received a non-final written warning about tardiness[6]—her first written warning since October 2021,

---

[5] Respondent asserts that there is no evidence in the record that Jamie Gapasin, Vallejo Clinic's Assistant Center Manager, had any knowledge of Mendoza's protected activities prior to March 10, 2023. However, the primary action alleged to be unlawful here was not Gapasin's tracking of Mendoza's tardiness and issuing of the non-final written warnings, but Hernandez's decision to terminate Mendoza. Moreover, Gapasin reported to Hernandez, and it is thus reasonable to infer that he acted at her request.

[6] There is also evidence that Respondent only began strictly enforcing its tardiness policy and instituted new sign-in rules at the Vallejo clinic after employees began to unionize. (Tr. at 543–548.)

nearly one-and-a-half years earlier. (Tr. 176–178; GC Ex. 18.) And Mendoza testified that when she was terminated in June 2023, Hernandez admonished her for informing the Union after receiving her non-final written warnings and suggested that she was only in this situation because of these actions. (Tr. 214–215.)

Satellite fails to rebut Petitioner's prima facie case. While it is true that Mendoza has been habitually late to work since 2019 and has received three written final warnings about her tardiness in the past, Satellite presents no evidence that she would have been terminated absent her Union involvement. Indeed, despite Mendoza's multiple prior final warnings, she not only was not suspended or terminated,[7] but received positive performance evaluations and merit wage increases of 2-4%, suggesting management has been willing to overlook her tardiness due to her otherwise strong contributions to the clinic. (Tr. 222.) Petitioner provides evidence, moreover, that habitual lateness was a common phenomenon among other employees at the Vallejo clinic. (Tr. 547 (current employee testifying that he saw other employees coming in late "almost every" Monday, Wednesday, and Friday shift); Tr. 592–93 (current employee testifying that he saw employees arriving late at least three to four times per week and admitting that he had been late to work "several times" but was never disciplined)). Satellite identifies no evidence to the contrary. Nor could it identify a single employee who was similarly terminated for being habitually late, when the Court inquired about the issue at oral argument.

### C.    Enforcement of tardiness and sign-in policies

Petitioner has demonstrated a likelihood of success as to its claim that Satellite began to enforce strict employee tardiness and sign-in policies at the Vallejo clinic in violation of Section 8(a)(5). Specifically, Petitioner presents evidence that after employees expressed interest in

---

[7] Satellite argues that Mendoza was never previously terminated because her prior final written warnings occurred at different clinics and each of her transfers "reset the clock" on her warnings. But there is no evidence to support this argument. Satellite identifies no evidence that clinics had a practice of ignoring prior discipline in other clinics, were instructed to do so, or lacked access to personnel files with prior warnings from other clinics. Satellite does not point to any other employees who avoided termination through transfers. Nor is there any evidence that Mendoza transferred between clinics to avoid discipline in the first place, as it is undisputed that she transferred back to Vallejo in 2022 to be closer to her mother, who was on hospice.

joining the Union, the Vallejo clinic supervisor announced that employees could not sign in more than five minutes before their shift time and that arriving even one minute late counted as tardy. (GC Ex. 22.)  The supervisor allegedly issued warnings to several employees who failed to comply with the rule, while there is evidence that in the past employees used to arrive more than five minutes early or one minute late without consequence.  (Tr. 202–04.)  The supervisor also asked employees to sign in and out of their paid breaks, which multiple employees testified was not prior practice.  (Tr. 198–99, 292.)

Satellite argues that this strict zero-tolerance tardiness policy does not contradict the clinic's written attendance policies.  However, this is no defense, as a new practice of enforcing a previously unenforced policy can constitute a unilateral change, as can newly strict enforcement of a preexisting rule.  *See, e.g.*, *Flambeau Airmold Corp.*, 334 NLRB 165, 171 (2001).  Thus, Satellite was required to provide notice and the opportunity to bargain with the Union about these changes, which it undisputedly failed to do.  Furthermore, Satellite is also likely in violation of Section 8(a)(5) for a separate reason: "[M]anagement violates § 8(a)(5) when it discharges an employee in whole or part based on the employee's violation of an unlawful unilateral policy change," *see El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 660 (5th Cir. 2012), and there is evidence that Satellite discharged Mendoza based, at least in part, on its conclusion that she had violated these new rules.  (GC Ex. 25.)

### D.    Threats to employees

Petitioner has established a likelihood of success on the merits as to the claim that Satellite threatened employees in violation of Section 8(a)(1).  An employer violates Section 8(a)(1) if its conduct would tend to coerce a reasonable employee in the exercise of their Section 7 rights.  *Saginaw Control & Engineering, Inc.*, 339 NLRB 541, 541 (2003).  Actions previously found to be violations include: suggestions that the business will close in response to unionization, *NLRB v. Lantz*, 607 F.2d 290, 298 (9th Cir. 1979); announcements that there will be no wage increase during union negotiations despite a history of providing increases, *First Student, Inc.*, 359 NLRB 208 (2012); and threats to "blacklist" employees for supporting a Union

or engaging in protected activity, *Alpha Cellulose Corp.*, 265 NLRB 177, 180 n.8 (1982).

Petitioner has produced evidence of each of these actions. Mendoza testified that, on March 10, 2023, Clinic Manager Hernandez expressed doubt that Satellite could meet the Union's demands, and hoped that Vallejo would not be forced to close but other clinics might. (Tr. 148–149, 576.) Mendoza also testified that during the bargaining committee's meeting with clinic leadership, Hernandez pointed to a sticky note on her computer, stating that it had the name of a job applicant who she had been warned by another clinic manager not to hire due to his Union involvement. (Tr. 576–77.) Multiple bargaining committee members testified that they interpreted Hernandez's statements to be a threat. (Tr. 554, 577.) Moreover, there is evidence that leadership across several clinics stated that the reason they could not give wage increases is because the clinics had to bargain with the Union first. (R Exs. 49–50, 64.)

Satellite's argues that these statements were "simply accurate and legal statements" that were not intended to be coercive. But Satellite does not produce any evidence demonstrating the factual basis on which these statements rest. *See, e.g.*, *Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1087 (C.D. Cal. 2015) ("Communicating a belief that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof.") (internal quotations omitted). And as discussed above, Satellite likely had no legal basis to withhold the wage increases and thus its statements that ongoing bargaining prevented it from issuing the increase were both inaccurate and unlawful.

### E.    Refusal to bargain

Petitioner has presented persuasive evidence that Satellite refused to bargain in violation of Section 8(a)(5) when it cancelled multiple bargaining sessions without compelling justification. The obligation to bargain "encompasses the affirmative duty to make expeditious and prompt arrangements, within reason, for meeting and conferring." *J.H. Rutter-Rex Mfg. Co.*, 86 NLRB 470, 506 (1949). "Considerations of personal convenience, including geographic or professional conflicts, do not take the precedence over the statutory demand that the bargaining

process take place with expedition and regularity." *Caribe Staple Co., Inc. & Suarez*, 313 NLRB 877, 893 (1994).

On January 4, 2023, in anticipation of certification, the Union demanded bargaining regarding the San Francisco, Gilroy, Morgan Hill, and Blossom Valley units, and requested information to prepare for bargaining.  (GC Ex. 2.)  After receiving some but not all of the requested information, the Union and Satellite discussed dates in April, but were not able to meet with Satellite until late September because Satellite unilaterally cancelled both the June bargaining session and the July and August sessions.  *See NLRB v. W. Coast Casket Co.*, 469 F.2d 871, 874–75 (9th Cir. 1972) (finding bad faith bargaining based in part on the fact that the employer's representative cancelled many of the scheduled negotiation sessions).  Satellite contends that cancellation of the June session was necessary because it had just entered into a management services agreement with U.S. Renal Care, which it claims may impact the operations of Satellite's bargaining teams.  (GC Ex. 9 at 001675.)  But Satellite identifies no evidence that U.S. Renal Care was involved in the bargaining process or in instituting the merit pay and tardiness policy changes.  In fact, none of its representatives ever attended a bargaining session with the Union (Tr. 72), nor does Satellite point to any evidence that U.S. Renal Care was involved behind the scenes in those negotiations.

Satellite's justification for cancelling the July and August bargaining sessions is equally unsupported in the record.  Satellite asserts that Marco Castellanos, Director of Employee Relations at the Vallejo Clinic, was Satellite's "primary and sole representative" in the bargaining process, and because he had to take unexpected personal leave, the bargaining sessions could not continue as scheduled.  (Tr. 74; GC Ex. 9 at 001672.)  But Petitioner points to persuasive evidence contradicting Castellanos's purportedly unique and indispensable role: Castellanos did not attend subsequent bargaining sessions even after he returned from leave (Tr. 85); Union representatives corresponded with other Satellite representatives to set bargaining dates before Castellanos went on leave (GC Ex. 9 at 001675); and Castellanos himself represented that he could not make commitments regarding bargaining logistics because he had

to first check in with a "team." (Tr. 65).

Delays from the cancellations likely affected the San Francisco, Gilroy, Morgan Hill, and Blossom Valley units, which had sought bargaining in January 2023. They also likely affected the units in Vallejo, which sought bargaining on May 3, 2023 (GC Ex. 9 at 001679), and Rohnert Park, which sought bargaining on July 11, 2023 (GC Ex. 12 at 001701).

However, because the Santa Teresa, San Leandro, Watsonville clinics first demanded bargaining *after* the cancelled August bargaining session, and the Folsom clinic first demanded bargaining only a few weeks before that session, there is likely no Section 8(a)(5) violation as to those clinics based on the cancellations. Petitioner and the Union do not identify the date on which the Milpitas unit demanded bargaining, and do not dispute Satellite's representation that such a demand had not been made as of July 20, 2024. (Dkt. No. 40 at 13.) As such, there is also insufficient evidence that these cancellations likely affected the Milpitas unit. Accordingly, no requirement of immediate bargaining will be ordered for the Santa Teresa, San Leandro, Watsonville, Folsom, and Milpitas units. There is not enough evidence that the collective bargaining process has been materially delayed for those units, given that bargaining sessions have been occurring regularly since September 2023. Nor has any evidence been submitted that Satellite has not been bargaining in good faith since September 2023, apart from its conduct regarding the merit wage increases, which will be addressed through injunctive relief requiring the prospective reinstatement of those increases, as detailed below.

Petitioner has also shown a likelihood of success on the merits as to its claim that Satellite delayed the bargaining process by failing to timely produce requested employee identification numbers and pay scale information. "The duty to bargain collectively" imposed by Section 8(a)(5) "includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative." *Nat'l Lab. Rels. Bd. v. Ingredion Inc.*, 930 F.3d 509, 517–18 (D.C. Cir. 2019) (citation omitted). "An employer violates the Act not only by refusing to provide such relevant information but also by not providing it in a timely manner." *Brewers & Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d

36, 45 (D.C. Cir. 2005).  The Board has found delays as short as two and three weeks violative of the Act, under certain circumstances.  *See, e.g.*, *Capitol Steel & Iron Co.*, 317 NLRB 809, 813 (1995).

From the record, it appears likely that Satellite not only refused to provide relevant information, but also unreasonably delayed turning the information over once it agreed to production.  On January 4, 2023, the Union requested employees' names, contact information, job classifications, wage rates, and benefits for the Gilroy, Morgan Hill, San Francisco, and Blossom Valley Clinics.  (GC Ex. 2.)  On March 31, nearly two months later, Satellite turned over a portion of the information, but objected to the production of employee identification numbers and pay scales,[8] to which the Union responded on April 6 reiterating why that information needed to be turned over and providing examples of documents that would satisfy the request.  (Tr. 50; GC Ex. 6 at 001659–001662.)  Satellite, who conceded at oral argument that wage scales and employee identification numbers are available electronically and were not burdensome to produce, now claims that it inadvertently did not produce the remaining information until September due to internal upheaval.  However, the fact that Satellite's bargaining representative initially objected to these demands without legitimate justification belies the inadvertence of the delay.  Internal upheaval is a similarly questionable excuse when the information at issue was easily available electronically.

Moreover, Petitioner provides evidence that the information eventually produced in September was riddled with technical issues, sparsely labeled, and difficult to follow.  (Tr. 104–07).  This likely contributed to further delays and prejudice in the bargaining process: The Union negotiators were not only deprived of critical information until mere days before the first bargaining session in September, but were forced to expend additional time and energy locating the documents they needed to formulate educated opening proposals.  (*See* GC Ex. 6 at 001659–001662 (explaining why pay scale information was crucial to formulating the union's opening

---

[8] Respondent does not dispute the relevance of this information to the bargaining process.

proposals).)

The Union also requested the same information for the Vallejo Clinic on May 3, 2023, Rohnert Park on July 11, 2023, and Folsom on August 7, 2023. (GC Ex. 9 at 001679; GC Ex. 12 at 001701, 001704.) Satellite did not produce *any* of the requested information for these clinics, including the information categories it did not object to, until September. While the delays for the Vallejo and Rohnert Park clinics are likely significant enough to constitute violations under Section 8(a)(5), the one-month delay in producing information regarding the Folsom clinic does not rise to the same level of conduct. Petitioner and the Union did not identify when the Milpitas unit demanded the information at issue, as noted above, so there is not sufficient evidence to find a likely violation on this basis as to the Milpitas unit either.

## III.    IRREPARABLE HARM

Petitioner has offered sufficient evidence of a likelihood of irreparable harm in the absence of an injunction. Likely irreparable harm is established in a Section 10(j) case by showing "a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *Frankl*, 650 F.3d at 1362. Courts have found certain practices—including the discharge of active and open union supporters, refusals to bargain, and changes to wages—to increase the risk of irreparable harm. *See, e.g.*, *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001) (discharge of union supporters "risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the bargaining process"); *Frankl*, 650 F.3d at 1363 ("Even if the Board subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties . . . [which] will increase as time goes on."); *E. Bay Auto. Council*, 483 F.3d 628, 634 (9th Cir. 2007) (unilateral changes to wages are "likely to have a long-lasting effect on employee support for a union because each paycheck reminds them of the likely irrelevance of the union").

Petitioner has provided ample evidence that Satellite's actions have—and continue to— weaken Union support at the various clinics. Both Union and clinic employees identified not

only a decline in employee morale since the elimination of the wage increase and Mendoza's termination, but also a decrease in Union participation.  (*See, e.g.*, Pet. Ex. O (Badilla testifying that the effect on morale was "devastating" and that much of his time as a clinic leader was spent comforting people who are frustrated about wage increases); Pet. Ex. N (Li testifying that many people were asking about him about the merit increase in the Blossom Valley clinic and sensing general frustration about the length of the bargaining process); Pet. Ex. U (Berdos testifying as to a general sense that people in his clinic do not like the Union)).  Union representative Jonathan Kim attested that attendance numbers at a recent strike indicated a drop-off in support at the San Francisco and Morgan Hill units and that he struggled to find employees who were willing to be on the Morgan Hill bargaining committee.  (Pet. Ex. M.)  Representative Eleni Johnson noted that only one Vallejo employee attended a Union mixer that occurred about a month after Mendoza's discharge.  (Pet. Ex. Y.)  Johnson also stated that she noticed unionized employees have become less responsive to her emails.  (*Id.*)

There is also evidence that employees are electing to leave unionized clinics to transfer to non-unionized clinics within Satellite or other employers altogether.  Kim attested that 7 out of 17 employees in San Francisco and 2 of the 7 employees in Morgan Hill have left their units. (Pet. Ex. M.)  This information was corroborated by Eugene De La Pena, an employee in the San Francisco office, who testified that employees were frustrated with the lack of raises and that multiple people had left or transferred to other Satellite Clinics.  (Pet. Ex. Q.)  Katherine Nies, a former employee in the Rohnert Park clinic, stated that she ended up seeking employment elsewhere because Satellite stopped issuing the annual wage increase.  (Pet. Ex. W.)

Even more troubling is the evidence that the Union is struggling to organize new clinics. Blossom Valley employee Nealsen Easen Pe Benito testified that the then non-organized Bascom clinic reacted negatively to his outreach and that he was concerned about being "bullied or ostracized for unionizing" at other non-organized clinics.  (Pet. Ex. S.)  He further testified that a nurse told him that she saw a technician telling the other floor staff at Bascom to avoid speaking

with the unionized employees because if they unionize, they will not get their merit raises.[9]  (Pet. Supp. Ex. A at 28–29.)

Satellite suggests that the Union's election victories at seven clinics from April 2023 to March 2024 undermines this evidence.  But as Petitioner points out, at the time these clinics voted to join the Union, their employees had already received their 2023 annual wage increases and may not have heard about the elimination of wage increases at other clinics.  Moreover, because Union elections are anonymous, the fact that employees were willing to vote for the Union in these elections sheds little light on their willingness to *publicly* support the Union during the critical phase of collective bargaining.  *See Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992) (bargaining units were "highly susceptible to management misconduct" during process of bargaining for first contract).

Taken together, Petitioner has adequately demonstrated that if these unlawful activities are allowed to continue until the Board's decision next year, support for the Union—and the employee interests it stands for—will likely be irreparably harmed.

## IV.    BALANCE OF THE EQUITIES

"[I]n considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the alleged[] unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority."  *Frankl*, 650 F.3d at 1365 (citation omitted).  Petitioner's strong showing of likely irreparable harm outweighs Satellite's evidence that it will be harmed in the interim.  Satellite has not shown that it would be harmed if the injunction issued.  Satellite would merely be required to continue bargaining as required and as it represents it has been doing since September 2023, revert tardiness and wage-

---

[9] Respondent contends that this testimony is inadmissible hearsay.  However, evidence need not be admissible to be considered at the preliminary injunction stage.  *See Houdini*, 166 F. App'x at 947.  In any event, the technician's statement may be admissible under Federal Rule of Evidence 803(3) as a statement of their then-present beliefs about how unionizing would impact their wages, and the nurse's statement to Pe Benito may be admissible under 803(1) as a present sense impression because she personally witnessed the technician's actions and appears to have told Benito soon after the event.

increase policies to what had already been in place before unionizing began, and offer to reinstate Mendoza, who management admits has made important contributions to the Vallejo Clinic (Tr. 252, 284, 363).

Satellite claims that reinstating the wage increase is beyond the court's authority because it does not reinstate the "status quo" and would impose "exceptional economic hardship" on Satellite. But the Court has already explained why the Board is likely to find the merit wage increase to be "status quo."  While Satellite's bargaining position may be weakened by this injunction, the alternative—to allow what is likely an unlawful labor practice to further weaken the Union's bargaining strength—is far worse.

## V.    PUBLIC INTEREST

Lastly, the public interest favors enjoining conduct contrary to the purposes of the Act. The public interest in a Section 10(j) case "is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge."  *Frankl*, 650 F.3d at 1365.  As detailed above, the record overwhelmingly shows that Satellite likely engaged in repeated and flagrant violations of the Act.  The public has an interest in preventing those ongoing unfair labor practices from continuing to erode union support and to undermine the purposes of the Act.

## ORDER

Based on the foregoing, it is **ORDERED** that, pending the final disposition of the matters now pending before the Board, Satellite Healthcare, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, are enjoined and restrained from:

a)    Failing and refusing to bargain in good faith with the Union as the exclusive collective-bargaining representative of the employees in the following bargaining units:

a.    Vallejo: All full-time, regular part-time, and per diem employees in the following classifications: RN Staff - Per Diem, RN Clinical Nurse I, IC RN3

Intermediate, IC RN4 Advanced, IC RN5 Expert, Certified Clinical Hemodialysis Technician (CCHT), Certified Clinical Hemodialysis Technician (CCHT) Advanced, Certified Clinical Hemodialysis Technician (CCHT) – Per Diem, and Environmental Services Technician; excluding all other employees, confidential employees, managers, guards, and supervisors as defined in the Act.

b.  San Francisco: All full-time, regular part-time, and per diem employees in the following classifications: Certified Hemodialysis Technician, Environmental Services Technician, Patient Care Technician Trainee, Certified Clinical Hemodialysis Technician, Certified Clinical Hemodialysis Technician – Advanced; excluding all other employees, confidential employees, managers, guards, and supervisors as defined in the Act.

c.  Rohnert Park: All full-time, regular part-time, and per diem employees in the following classifications: IC RN3 – Intermediate, IC RN4 – Advanced, Nephrology Social Worker (MSW I), Nephrology Dietician I, Nephrology Dietician II, Certified Hemodialysis Technician, Environmental Services Technician, Patient Care Technician Trainee, Certified Clinical Hemodialysis Technician, Certified Clinical Hemodialysis Technician – Master, Certified Clinical Hemodialysis Technician – Advanced, Certified Clinical Hemodialysis Technician – less than 1 year; excluding Manager, Center 2 – Advanced; all other employees; confidential employees; managers; guards; and supervisors as defined in the Act.

d.  Morgan Hill: All full-time, regular part-time, and per diem employees in the following classifications: Certified Clinical Hemodialysis Technicians (CCHT); Certified Clinical Hemodialysis Technicians (CCHT), Advanced; and Certified Clinical Hemodialysis Technicians (CCHT), Master; excluding professional employees; Center Managers, office clerical employees, guards,

and supervisors as defined by the Act.

    e.  Blossom Valley: All full-time, regular part-time, and per diem employees in the following classifications: IC RN3, Intermediate; IC RN4, Advanced; Social Worker, MSW I; RN, Staff – PD; Nephrology Dietitian I; Certified Clinical Hemodialysis Technician (CCHT); Certified Clinical Hemodialysis Technician (CCHT), Advanced; Certified Clinical Hemodialysis Technician (CCHT), Master; Patient Care Technician Trainee; Environmental Services Technician; and Licensed Vocational Nurse (LVN); excluding Center Managers; office clerical employees; guards; and supervisors as defined by the Act

    f.  Gilroy: All full-time, regular part-time, and per diem employees in the following classifications: Home RN4, Advanced; Home RN5, Expert; IC RN3, Intermediate; IC RN4, Advanced; Social Worker, MSW II; Nephrology Dietitian I; RN, Staff – PD; Certified Clinical Hemodialysis Technician (CCHT); Certified Clinical Hemodialysis Technician (CCHT), Advanced; Certified Clinical Hemodialysis Technician (CCHT), Master; Patient Care Technician Trainee; and Environmental Services Technician; excluding Center Managers; office clerical employees; guards; and supervisors as defined by the Act.

b) Failing and refusing to bargain in good faith with the Union by withholding the 2023 annual merit wage increases from bargaining unit employees at its San Francisco, Blossom Valley, Morgan Hill, and Gilroy facilities without first notifying and giving the Union an opportunity to bargain;

c) Failing and refusing to bargain in good faith with the Union by making unilateral changes to the wages, hours, or other terms and conditions of employment of bargaining unit employees without first notifying and giving the Union an opportunity to bargain or reaching a legally valid bargaining impasse;

d)  Failing and refusing to bargain in good faith with the Gilroy, Morgan Hill, San Francisco, Blossom Valley, Vallejo, and Rohnert Park units by delaying provision of requested information relevant to the Union's representational duties;

e)  Unilaterally changing terms and conditions of employment for bargaining unit employees, including by changing time and attendance policies;

f)  Withholding annual merit wage increases in retaliation for employees' Union activities or support;

g)  Disciplining employees for engaging in Union and/or protected concerted activities;

h)  Discharging employees for engaging in Union and/or protected concerted activities;

i)  Making coercive statements that the Employer will withhold benefits, including annual merit wage increases, from unit employees in retaliation for selecting the Union as their bargaining representative and engaging in collective bargaining;

j)  Making coercive statements that employees do not have a right to Union representation at investigatory meetings in which they reasonably think they may be questioned and disciplined;

k)  Making coercive statements to employees that unionization and/or collective bargaining would be futile because the Employer cannot meet the demands of the Union;

l)  Threatening to enforce time and attendance policies more strictly in retaliation for their Union and/or protected concerted activities;

m) Threatening to blacklist unit employees in retaliation for their Union and/or protected concerted activities;

n)  Threatening not to hire unit employees at the Employer's facilities in retaliation for their Union and/or protected concerted activities;

o)  Threatening to close the Employer's facilities if employees select the Union as their collective-bargaining representative;

p)  Interfering with, restraining, or coercing employees in any like or related manner in

the exercise of their rights guaranteed under Section 7 of the Act; and,

q) Making changes to employees' terms and conditions of employment in retaliation for their Union activities or affiliation by, including but not limited to, withholding employees' annual merit wage increases, and enforcing time and attendance policies more strictly against employees;

**IT IS FURTHER ORDERED** that, pending the final disposition of the matters now pending before the Board, Satellite, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, shall take the following affirmative steps:

a) Immediately bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of unit employees at its San Francisco, Blossom Valley, Morgan Hill, Gilroy, Vallejo, and Rohnert Park facilities;

b) Within **twenty-one (21)** days of the issuance of this Order, restore the established practice of granting annual wage increases by prospectively granting, on an interim basis, employees at the Employer's San Francisco, Blossom Valley, Morgan Hill, and Gilroy facilities the annual merit wage increases they would have received on April 7, 2023, the date on which the Employer issued these increases to its non-represented employees, consistent with the criteria managers were asked to utilize in their 2023 merit wage increase training, and the minimum amount of increases the Employer historically issued to employees at each facility from 2020 to 2022;

c) Within **twenty-one (21)** days of the issuance of this Order, restore the established practice of granting annual wage increases by prospectively granting, on an interim basis, employees at the Employer's San Francisco, Blossom Valley, Morgan Hill, Gilroy, Vallejo, Milpitas, Rohnert Park, Folsom, Santa Teresa, San Leandro, and Watsonville facilities the annual merit wage increases they would have received in April 2024, the month in which the Employer issued these increases to its non-represented employees, consistent with the criteria managers were asked to utilize in

their 2023 merit wage increase training, and the minimum amount of increases the Employer historically issued to employees at each facility from 2020 to 2022;

d) Within **fourteen (14)** days of the issuance of this Order, at the Union's request and on an interim basis pending Board adjudication of the merits of the related unfair labor practice cases, rescind any or all unilateral changes to bargaining unit employees' terms and conditions of employment, including: altering its time and attendance policies by requiring employees to sign in and out for lunch and afternoon breaks, as announced at the Employer's Vallejo facility on or about May 3, 2023; and altering its time and attendance policies by prohibiting employees from clocking in more than five minutes before the start of their shift and considering employees late if they clocked in more than one minute after the start of their shift, as announced at the Employer's Vallejo facility on or about May 5, 2023;

e) Within **fourteen (14)** days of this Order, offer, in writing, interim reinstatement to Cathy Mendoza to her former position of employment or, if that position no longer exists, to a substantially equivalent position, displacing, if necessary, any employee who may have been hired or reassigned to replace her, without prejudice to her seniority or any other rights or privileges she previously enjoyed;

f) Within **fourteen (14)** days of the issuance of this Order, on an interim basis, rescind the disciplinary warnings issued to Mendoza between March 1, 2023, and April 4, 2023, refrain from relying on these unlawful disciplinary actions in assessing any future discipline pending the Board's adjudication of the merits of the underlying unfair labor practice cases, and inform Mendoza in writing of the interim rescissions;

g) Within **fourteen (14)** days of the issuance of this Order, post physical copies of this Order at the Employer's San Francisco, Blossom Valley, Morgan Hill, Gilroy, Vallejo, Milpitas, Rohnert Park, Folsom, Santa Teresa, San Leandro, and Watsonville facilities, as well as translations in other languages as necessary to ensure effective communication to all of the Employer's employees as determined by the Board's

Regional Director of Region 20, said translations to be provided by the Employer at the Employer's expense and approved by the Regional Director, on the bulletin board, in all breakrooms, and in all other places where the Employer typically posts notices to its employees; maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to each facility to monitor compliance with this posting requirement;

h) Within **fourteen (14)** days of the issuance of this Order, distribute via electronic mail copies of this Order to all employees at the Employer's San Francisco, Blossom Valley, Morgan Hill, Gilroy, Vallejo, Milpitas, Rohnert Park, Folsom, Santa Teresa, San Leandro, and Watsonville facilities;

i) Within **fourteen (14)** days of the issuance of this Order, distribute via text message copies of this Order to all employees at the Employer's San Francisco, Blossom Valley, Morgan Hill, Gilroy, Vallejo, Milpitas, Rohnert Park, Folsom, Santa Teresa, San Leandro, and Watsonville facilities;

j) Within **twenty-one (21)** days of the issuance of this Order, convene one or more mandatory meetings, on working time and at times when the Employer customarily holds employee meetings and scheduled to ensure the widest possible attendance, at the Employer's San Francisco, Blossom Valley, Morgan Hill, Gilroy, Vallejo, Milpitas, Rohnert Park, Folsom, Santa Teresa, San Leandro, and Watsonville facilities, during which the portion of this Order specifying the relief granted will be read to unit employees by a responsible official of the Employer in the presence of a Board agent, or at the Employer's request, by a Board agent in the presence of a representative of the Employer. Interpreters shall be made available for any individual whose language of fluency is other than English at the Employer's expense. The Employer shall announce the meeting(s) in the same manner it would customarily

announce a meeting to employees; the meeting(s) shall be for the above-stated purpose only. Individuals unable to attend the meeting to which they have been assigned will be able to attend a subsequent meeting during which the same reading shall take place under the same conditions. The Employer shall allow all employees to attend these meetings without penalty or adverse employment consequences, either financial or otherwise;

k) Within **twenty-eight (28)** days of the issuance of this Order, file with this Court and submit a copy to the Regional Director of Region 20 of the Board, a sworn affidavit from a responsible official of the Employer setting forth, with specificity, the manner in which Satellite has complied with the terms of this Order, including how it has posted the documents required, how and where the documents have been posted, and the date(s), time(s), and location(s) that the portions of the Order specifying the relief granted was read to employees and by whom.

**IT IS FURTHER ORDERED** that this case shall remain on the docket of this Court and on compliance by Satellite with its obligations described in this Order, and upon disposition of the matters pending before the Board, the Petitioner shall cause this proceeding to be dismissed.

**IT IS SO ORDERED.**

Dated: December 23, 2024

RITA F. LIN
United States District Judge